Ferdinand Pecora, J.
This is an action for a declaratory judgment, in which the court is asked to declare the rights and other legal relations between the parties, with respect to the public performance rights in and to three songs entitled “ You Fit Into The Picture ”, “ Bluer Than Blue ” and “ Mississippi River”. The determination of these rights in each of these songs is made the subject of separate causes of action.
The plaintiffs are Broadcast Music, Inc. (hereinafter referred to as BMI), and Edward B. Marks Music Corporation (hereinafter referred to as Marks). Each is a New York corporation, engaged in the music purveying and publishing business.
The defendants are Deems Taylor, as president of American Society of Composers, Authors and Publishers (hereinafter referred to as Ascap), and five individual defendants named Bud Green, Jesse Greer, J. Rosamond Johnson, Lew Pollack and Tot Seymour, each of whom is a song writer or composer, and a member of Ascap. Pollack and Seymour are the writers of the song ‘ ‘ Bluer Than Blue ’ ’. Green and Greer are the writers of the song “ You Fit Into The Picture ”. Johnson is one of the writers of the song ‘ ‘ Mississippi River”, his collaborator therein being one Frank Abbott who has never been a member of Ascap, and has not been made a party defendant. The copyright of each song is in the name of Marks.
Ascap is a nonprofit, unincorporated association consisting of more than seven members. It is engaged solely in issuing licenses for the nondramatic public performance for profit of the musical compositions of its members, and distributes to them the net fees it collects from its licensees. Its licensees consist principally of the owners of hotels, cabarets, radio stations, motion picture theaters and other places of public amusement. Its work has grown from a modest beginning in 1914 to a state where it now collects several million dollars annually in fees from its licensees.
*12 In their complaint, Marks claims to be the exclusive owner of the rights of public performance of the three songs. BMI claims to be the exclusive licensee of those rights, under a five-year grant thereof from Marks, dated December 6, 1940 and expiring on December 31,1945. They allege that the defendants assert conflicting rights therein. Hence the plaintiffs ask for a declaration of those rights favorable to them.
A considerable amount of testimony has been presented to the court, and the exhibits which have been received in evidence are many, some of them being quite voluminous.
I deem it appropriate, at the outset, to consider whether it would be a sound exercise of discretion to give any declaratory judgment in this case. After joining issue, Ascap moved at Special Term for a dismissal of the complaint upon the ground that the cause was not a proper one for a declaratory judgment owing to the presence therein of complicated questions of fact, and because plaintiffs had an adequate remedy by suits for infringement. The learned Special Term denied the motion in a memorandum decision saying: ‘ ‘ The action is not one for infringement and it does not clearly appear that the plaintiffs have an adequate remedy at law, or that complicated questions of fact are presented which should deprive the plaintiffs of the remedy of declaratory judgment. ’ ’ Upon appeal to the learned Appellate Division, the denial was affirmed without opinion. (See Broadcast Music v. Taylor, 266 App. Div. 721.) ■ — One Gene Buck at that time being the president of Ascap. Obviously the motion was decided solely upon the pleadings. But upon the trial before me, the merits have been fully explored by able and diligent counsel on behalf of all the parties.
In my opinion, a court of equity should not be asked, in the guise of an action for a declaratory judgment, to give advice as to their legal rights to plaintiffs who seem to have deliberately created a situation which they knew to be fraught with possibilities for litigation. Persons who consciously place themselves in the way of trouble should not ask the court to steer them out of it by a declaration. Where under such circumstances they encounter trouble, they should be remitted to their ordinary legal remedies to avoid its consequences.
That, it seems to me, is the situation established by the evidence in this case. When Marks, on December 6, 1940, entered into its written agreement with BMI whereby the latter was granted a license for the public performance rights of the three songs in suit, for a five-year term commencing on January 1, 1941, and terminating on December 31, 1945, it (Marks) was a publisher member of Ascap and with its predecessors in interest *13 had been such a member since 1917. This fact was fully known to BMI at the time. Indeed, the general manager and vice-president of BMI was one Merritt E. Tompkins, who himself had for years been a fellow member, with Marks, of Ascap.
By the terms of the contract between the plaintiffs, Marks purported to give BMI a five-year license to publicly perform all the songs which Marks had in its catalogue, which were about 20,000 in number. Of these about 3,000 were composed by about 250 members of Ascap, including the three songs in suit. The consideration for the license was one million dollars, payable in five annual installments of $200,000, 10% of which, however, is required to be paid to one Julian T. Abeles, an attorney who apparently brought the contracting parties together.
That contract contains a significant provision which exempts Marks from giving BMI any warranty of its right to grant licenses for the public performance of any of the songs written by members of Ascap, although it gave such-warranty in respect of the other songs in its catalogue. It also gives to BMI “ the right, at its sole cost and expense, to cause all of the rights licensed to BMI under this agreement, to be adjudicated by suits for declaratory judgments or otherwise, to enforce and protect such licensed rights, * * * and in the sole judgment of BMI to join Marks and all others, deemed by BMI to be necessary parties, as parties plaintiff or defendant in suits or proceedings based thereon "
The evidence also shows that BMI, in granting sublicenses for the public performance of the 20,000 songs embraced in the Marks catalogue, excepted those written by Ascap members from its indemnification to its sublicensees against any loss or damage for infringement.
Thus the plaintiffs entered into their contractual relations with full knowledge of the perils confronting them in relation to the public performance rights of the songs which were the creation of Ascap members.
Another phase of this ease which might well deter this court from granting plaintiffs a declaratory judgment revolves around a provision in the contract between the plaintiffs which gives to BMI the option, at any time during the licensed term, to purchase all of the capital stock of Marks for one million dollars. As the right to exercise this option will expire on December 31 of this year — about eight months hence — a declaration by this court conceivably would have the effect of advising BMI whether its exercise of the option would constitute good business acumen. It certainly is not the duty of the *14 court to give such counsel in the form of a declaratory judgment, to parties contemplating business ventures. (Post v. Metropolitan Cas. Ins. Co., 227 App. Div. 156, 158, affd. 254 N. Y. 541.)
A third aspect of the case which might well cause this court to withhold the declaration sought by plaintiffs, is presented by the fact that the only practical value to them of such a declaration would be its availability either as support for a cause of action for infringement, or as a defense thereto.
It is elementary that the Federal courts have exclusive jurisdiction in actions for infringement. While it is true that an action to determine the title to a patent or copyright will lie in this court (New Era Elec. Range Co. v. Serrell, 252 N. Y. 107), there is grave doubt in my mind whether it would be a sound exercise of this court’s discretion to make a declaration whose principal, if not sole, value would be as res judicata for use in an action for infringement which may be brought only in the Federal courts. That such a declaration, if made here, would constitute res judicata (if it be assumed that this court has jurisdiction in the case at bar), is clear upon the authority of Becher v. Contoure Labs. (29 F. 2d 31, affd. 279 U. S. 388).
This doubt is reinforced by the fact that actions for declaratory judgments may now, since the enactment of the Federal Declaratory Judgment Act (U. S. Code, tit. 28, § 400) be brought in the Federal courts. Nor need one wait until he has actually been charged with infringement, before bringing such an action. In the case of Grip Nut Co. v. Sharp (124 F. 2d 814, 815) the court said: “ Before the passage of the Federal Declaratory Judgment Act, the question of infringement of a patent presented a controversy ' under the patent * * * laws ’ only when the patentee brought suit against the alleged infringer. * * * Until then the patentee could harass the alleged infringer by threatening infringement proceedings and injure bis business by cowing his customers and dealers. Today, the alleged infringer, once he is threatened by a patentee, has a remedy by a complaint for a Declaratory Judgment.”
The learned counsel for plaintiffs maintain that such a declaratory judgment action between the present parties would not lie in the Federal courts because of the absence of a diversity of citizenship. In my opinion that contention is untenable, as the Federal courts have exclusive and plenary jurisdiction in actions for infringement, which jurisdiction they possess irrespective of the element of diversity of citizenship. See King v. Marks Music Corp. (56 F. Supp. 446) where the defendant interposed a counterclaim seeking relief by way of a declaratory *15 judgment, and succeeded upon motion in bringing in Ascap as a third-party defendant, despite the asserted lack of a diversity of citizenship.
I seriously question the wisdom and propriety of a State court making an adjudication which is calculated to estop the Federal courts in advance from exercising a jurisdiction which is peculiarly theirs, even though the State courts have power to do so.
There is a further factual situation disclosed by the evidence which, under ordinary circumstances, would make this court reluctant to grant plaintiffs the relief for which they ask. That is the apparently nominal value of the public performance rights attaching to the three songs in suit. The evidence shows that none of them has attained any vogue or acquired any popularity; and for some years, so far as known, there has been no public performance of them. It was admitted upon the trial, by plaintiffs, that these songs were selected at random for the purposes of this action. I see no reason why the legal maxim de minimis non curat lex should not apply to an action for a declaratory judgment.
Counsel for plaintiffs assert, however, that while the rights in only these three songs are directly involved in this action, there are indirectly involved the rights in many hundreds of other songs included in the Marks catalogue written by many other Ascap members. Counsel for plaintiffs frankly say “ the decision in this case will no doubt constitute a precedent with respect to the ownership of the performing rights in those other compositions.” No judgment in this case could be res judicata as against any Ascap composers who have not been made parties herein.
If plaintiffs’ counsel were to seek directly a determination of their rights to the other songs in the Marks catalogue written by Ascap members not parties to this action, this court would necessarily decline to make a declaration of the rights of parties not before the court. A fortiori, the court should not.permit plaintiffs to obtain by indirection that which would have to b< denied to them if sought directly. It is inevitable, therefore, that any declaration which this court might deem it proper to make, would be limited to the rights of the parties in and tc the three songs in suit.
As already observed, the learned Appellate Division ha¡r> ruled that this is a proper action for a declaration. Although only the pleadings were before the court on that occasion, I am uncertain, since no opinion was rendered by the Appellate Division, whether that court intended a direction that the merits be *16 determined upon the trial. I shall therefore proceed to resolve the case upon the merits. This course is further commended to my judgment because of the long and expensive trial through which the parties have labored, and because it would tend to solve the whole controversy with a greater promise of finality.
According to the evidence, Ascap was organized on February 13, 1914, for 99 years, as a voluntary nonprofit, unincorporated association, under the leadership of a small group of prominent composers, authors and publishers which included Victor Herbert, Irving Berlin, Ernest R. Ball and Gene Buck. Prior thereto, song writers (including composers and lyricists) had received practically no royalties or other compensation for the nondramatic public performance for profit of their songs, despite the fact that under the Copyright Act of 1897 (U. S. Code, tit. 17, § 36) they were entitled thereto. This unjust condition largely was due to the inherent difficulties which confronted them individually in enforcing their rights to such compensation. Individually they lacked the means and the ability to detect infringers throughout the country, and to call them to account.
The principal purposes for which Ascap was formed, as stated in its articles of association, are “ to grant licenses and collect royalties for the public presentation of the works of its members * * * and to allot and distribute such royalties. ”
Only recently our highest court held, in the case of Gem Music Corp. v. Taylor (294 N. Y. 34, 38) decided March 1, 1945 that its articles of association, as amended from time to time, are “ the law of ASCAP binding upon all its members.”
Its articles provided that one becoming a member of Ascap must assign to it the right of public performance for profit in and to every musical composition of which he was the composer, writer or copyright owner; he was also required to assign to it similar rights in and to any composition of which he subsequently, and while a member of Ascap, became the composer, writer or copyright owner immediately upon his creation thereof or its acquisition by him. These assignments were in substance effected by the signing of an application for membership and the signer’s election to membership. There were other provisions by which members were required to register their compositions with Ascap. All of these provisions were embodied in Article III (§§ 4, 5); Article IV (§ 2); and Articles XXI and XXXV. Under these assignments, Ascap became vested with the sole right to issue licenses to users of music to publicly perform for profit the compositions of its members.
*17 The increase in the membership of Ascap during its first seven years, while contributing to its prosperity, also brought in its wake increasing problems of administration. It became desirable, among other things, to prevent members withdrawing at will and thereby taking out their compositions from Ascap’s catalogue.
This was accomplished on December 1, 1920, by an amendment to Article III (§8), which vested in Ascap for a period of five years from January 1, 1921, the performing rights to the compositions of its members. Under this amendment, members were required to sign formal agreements of assignment for such five-year period.
Upon the expiration of this five-year period, on December 31, 1925, those who desired to continue as members, were required to sign similar agreements for a second five-year period, expiring on December 31, 1930. This process was repeated upon the expiration of the second five-year period, as well as upon the expiration of the third five-year period on December 31, 1935, and upon the expiration of the fourth five-year period on December 31,1940, except that upon the expiration of the fourth period, the agreements were made for 10 and 15-year periods.
The five individual defendants have continued their respective memberships in Ascap by signing the requisite period agreements.
The plaintiff Marks continued its membership in Ascap down to December 31, 1940, by signing the first four period agreements. It failed, however, to sign any agreements subsequent to the last-mentioned date. Instead, on December 6, 1940, it entered into the agreement with BMI which has already been discussed. By resolution adopted on March 27, 1941, Ascap declared the membership of Marks terminated as of December 31,1940.
When Article III (§ 8) was amended on December 1, 1920, Ascap also amended Article Ilia (§ 1), by increasing its board of directors from 18 to 24 members, 12 of whom were to be publishers and the other 12 authors or composers. At the same time Article XIX (§ 1) was amended so as to provide that the net royalties collected by Ascap from its licensees were to be divided into two equal parts, one of which in turn was to be distributed among the publisher members, and the other part among the author and composer members.
These two amendments were adopted to encourage music publishers to affiliate with Ascap, and in pursuance of an understanding with certain publishers who were then banded together *18 in an organization of their own called the Music Publishers’ Protective Association. As a result thereof most of those publishers joined Ascap.
It is the contention of plaintiffs that Marks, as the copyright owner of the three songs in suit, exclusively possessed all the rights therein, including those for public performance, on January 1, 1941, when its license agreement with BMI went into effect, and that it had the exclusive right to grant the license to those rights to BMI.
The defendants, on the other hand, insist that those rights were, and have continued to be, vested in Ascap because of the membership of the individual defendants in Ascap; except, however, that with respect to the song “ Mississippi Biver ”, they concede that Ascap has only a nonexclusive performing right therein, owing to the fact that Frank Abbott, who collaborated in its creation with defendant Johnson, never was a member of Ascap.
In deciding between these conflicting claims, it becomes necessary to determine the relationship between Marks and the individual defendants which was created by their membership in Ascap.
All the circumstances established by the evidence make it clear that that relationship is basically a joint venture for the commercial exploitation of the performing rights to the songs in suit by Ascap, with a division of profits between the publishers on the one hand and the authors and composers on the other. That relationship, mainly indicated by the articles of association and the proceedings of Ascap, as well as by the conduct of the parties through the years, underlies and qualifies the various dealings of the parties in this case. It is the failure of the plaintiffs to recognize this primordial and continuing agreement of the parties which constitutes the main fallacy in their contentions.
Into this joint venture the authors and composers placed their songs; and similarly the publishers contributed their copyright rights. The function of Ascap was to grant licenses to third parties to perform these songs, and to deal with any infringers thereof. The resultant profits it was to divide half and half between the publishers and the creators of the songs. Whatever powers or title Ascap required to accomplish this exploitation of the performing rights to the songs were vested in it not only by the acts and agreements of its members, but also by the inherent character of the joint venture. Originally it appeared that all that was deemed sufficient was to endow *19 Ascap with an agency. Subsequently, experience revealed that better results were attainable if it took title to the performing rights in the songs. That was one of the principal purposes of the five-year written contracts which its members made from time to time with it.
Those contracts were not intended to supersede the basic agreement of the parties implicit in their membership in Ascap. They were, instead, confirmatory thereof. Not only did those confirmatory contracts specifically provide that they were subject to the other and existing contracts with Ascap — and of those existing contracts the membership agreement was manifestly the most important — but even if they had not stated so in terms, the result would be the same. The underlying compact was the joint venture, expressed and implied in the very structural arrangement of Ascap itself. To that all else was incidental and subordinate.
The fact that the publisher held title to the copyright of the songs, for example, was altogether subordinate to the joint venture. He held that title only to the end that the exploitation of the songs might be more advantageously achieved. He was in this respect merely a trustee for Ascap and its members. His rights were analogous to those of a partner who holds title to partnership real estate for his firm. As was said by Field, C. J., in Dupuy v. Leavenworth (17 Cal. 262, 268) “ The possessor of the legal title in such case holds the estate in trust, for the purposes of the copartnership.” Therefore there is no illegal cutting down of the publisher’s rights in subjecting his copyright to the equitable rights of his coadventurers. Nor is there any inconsistency or contradiction involved in viewing the five-year assignments, together with the underlying contract, as mere modus operandi for effectuating the basic purpose and intent of the parties as members of Ascap.
Indeed, the very contracts made by the song writers with Marks, under which the latter acquired its rights to the songs, were on forms prepared by Ascap, and contained the proviso that they were “ subject to any existing agreement between all of the parties hereto and the American Society of Composers, Authors and Publishers. ’ ’ The term ‘‘ any existing agreement ’ ’ is all-embracing and includes not only any period contract then in effect, but also the basic or underlying agreement which came into existence with the acquiring of membership in Ascap and continued in force during the duration of such membership by either the publisher or the creator. This circumstance seems to be ignored or overlooked by plaintiffs in their reasoning.
*20 The consequences from this relationship follow clearly. It was a breach of its contract, and a breach of trust as well, for Marks to attempt to cut off the rights of its coadventurers by licensing to BMI the performing rights to the songs in suit without their consent, and without their receiving any part of the consideration paid to Marks for the license. As BMI knowingly participated in that misconduct of a fiduciary, it too is liable for the breach of trust. (Irving Trust Co. v. Deutsch, 73 F. 2d 121, 123, 125, cert, denied 294 U. S. 708.) BMI, which contracted with Marks with full knowledge and notice of the entire situation, is in no better position than Marks, and can acquire no rights in the three songs in antagonism to Ascap and its members.
The fact that the license to BMI was not to take effect until the last five-year contract between Marks and Ascap had expired is immaterial. The expiration of that contract and the termination of Marks’ membership in Ascap did not discharge or end the rights which spring from the underlying relationship. When that stage was reached, Marks could take with it only that which it owned in its absolute and unqualified right; but it could take no more. It could not destroy the equitable rights which attached to the songs in favor of Ascap and its other members, including the authors and composers of the songs in suit. It still held the copyrights in trust for them.
This joint venture relationship, by its very nature created certain mutual and reciprocal rights, benefits and obligations upon and between the publisher members of Ascap as a class, and its author and composer members as another class.
Because of these mutual rights, benefits and obligations, no publisher member could withdraw from Ascap without the consent of the writer member who created the work of which the publisher held the copyright in trust, and take with him upon such withdrawal the absolute copyright rights freed from the burdens of that trust. To hold otherwise would give sanction to the proposition that the publisher members could at will divest themselves of those burdens, and leave the creators of the songs without compensation for the performing rights to their songs. That would amount to a ruthless violation of the underlying pact made between publishers and creators when they became members of Ascap, to divide such compensation equally between them; and it would shock the sense and spirit of equity. Trust responsibility is not a garment to be doffed at the mere pleasure of the wearer.
*21 The record before the court is not barren of convincing proof that the plaintiffs themselves had more than a mere inkling of the rights possessed by the defendants when they entered into their bargain on December 6, 1940. That proof may be found, for instance, in those provisions of their contract, already referred to, whereby Marks is exempted from giving warranty of its title to the performing rights to the songs in its catalogue written by Ascap members. It is also to be perceived in part in the fact that BMI, in turn, exempted those songs from the indemnification it gave to its sublicensees against infringement.
Upon the entire record, it is my opinion that the defendant Ascap is now, and has been since prior to December 31, 1935, the beneficial owner of the public performance rights in and to the songs “ You Fit Into The Picture ” and “ Bluer Than Blue ”, with the sole right to grant licenses therefor; and that as to the song “ Mississippi River ”, one of the composers of which was not a member of Ascap, both the plaintiffs and the defendant Ascap now have, and have had since December 31, 1940, a nonexclusive interest in the public performance rights thereto, with the power to issue licenses to others for its public performance for profit.
The individual defendants plead a counterclaim against Marks, in which they seek the rescission of their copyright contracts with Marks, relative to the songs in suit, and the return to them of all right, title and interest in and to the songs and in and to the copyrights therein.
I think they have abundantly established their right to such relief. One who undertakes to work property, such as a copyright on a royalty arrangement, becomes obligated to work it in good faith and for the benefit of the recipient of the royalties, as well as for his own avail. If he fails so to do, and thereby destroys the essential object of the royalty contract, rescission thereof may be decreed. (Matter of Waterson, Berlin & Snyder Co., 48 F. 2d 704, 710; Dwight & Lloyd Sintering Co. v. American Ore Reclamation Co., 44 F. Supp. 391; Driver-Harris Co. v. Industrial Furnace Corp., 12 F. Supp. 918.)
Attention has already been drawn to the fact that Marks, in its dealings with BMI, deliberately breached its fiduciary duty to the individual defendants. The evidence shows that the principal income derived by song writers from their creations comes from the license fees paid for their public performance rights. In its transaction with BMI, Marks refrained from warranting its title to the performing rights to the songs in its catalogue written by Ascap members. Consequently BMI refused to put *22 those songs on its indemnified list in granting sublicenses to others to perform them. As a result these songs have not since then been publicly performed so far as known, and their creators have not received any income from their exploitation; nay, not even a cent from the one million dollar consideration paid by BMI under its contract with Marks. In this connection it is important to note that upon the trial the only executive officer of Marks who took the stand testified that his company did not consider itself obligated to pay any part of that handsome consideration to any of the writers of its songs.
All of the defendants, in their answers, interpose the affirmative defense that the acts and agreements, between the plaintiffs were in furtherance of a conspiracy to wreck Ascap. While the proof shows clearly that BMI was organized at the instance of radio broadcasting interests to compete with Ascap and to beat down the latter’s licensing fees, it fails to satisfy me that the acts of the plaintiffs amounted to a conspiracy in fraud of the rights of the defendants.
The court will make findings and conclusions in conformity with the foregoing. Settle judgment in favor of the defendants, with costs, embodying the declarations and decisions above indicated.