Bergan, J.
Plaintiff corporation is the copyright owner of a series of books on basic electricity, the publication of which is the subject of this litigation. Defendant Hayden Book Company, Inc. has merged with, and is the successor of, John F. Rider Publisher, Inc., which, under agreement with plaintiff, published the series. Defendant Hayden Publishing Company, Inc. is the owner of all the stock of the merged companies.
Although defendants are separate corporate entities, the court at Special Term found the parent company’s officers and employees so controlled the actions of their subsidiaries in the present controversy that unitary liability to the plaintiff arising from the publication of the books could be imposed on both corporations. In this respect the Appellate Division affirmed the facts as found. It cannot be said as a matter of law on this record that if Hayden Book is liable the separate corporate entity of Hayden Publishing shields it from liability. For convenience, therefore, both defendants will here be called the “publisher” and the corporate plaintiff the “author”.
*43 Assuming facts most favorable to the author, consistently with the findings which have been affirmed by the Appellate Division, an agreement between the parties was entered into in November, 1954 for the publication of the electronics books. The publisher agreed to pay the author a royalty of 15% of the list price of books sold. The contract contained an undertaking by the publisher to use its- “ best efforts ” in promotion of the books. Following upon execution of this agreement, a five-volume set entitled Basic Electricity, and a five-volume set entitled Basic Electronics, were published in 1954 and 1955; and in 1959 a sixth volume on transistors was added to Basic Electronics.
These publications were the publisher’s best sellers and accounted for a substantial part of its income. In 1962 the author and publisher discussed a new and later edition of the author’s works. The publisher asked a reduction in royalties if this were to be done. Financial discussions lasted about a year. It apparently became clear in the fall of 1963 that the author would not agree to a lower rate.
The publisher then hired Harry Mileaf and three other writers to prepare a new group of electronic books entitled Electricity 1-7 and Electronics 1-7, the “ Mileaf ” books. This effort was not disclosed to the author, but was “ concealed ”, as plaintiff argues in this court. The Mileaf books utilized a very similar method of organizing, presenting and picturing the material. The agreements between the publisher and Mileaf and the other writers of the new group of books as to what they were to produce could well be regarded as an exact description of the author’s existing books.
The publisher did not disclose to the author what it was doing, but when inquiry was made, on the basis of reports in the trade, the Mileaf enterprise was denied orally and in writing. The Mileaf books were published in 1966 and 1967. The publisher made efforts to sell them to customers who had been placing large orders for the author’s books. The advertising for these books was very similar to that for the author’s.
In 1967, when the publisher began to advertise Mileaf, the magazine advertisement of the author’s works was suspended. There is a memorandum from the publisher’s sales manager to *44 its salesmen, which notes that ‘ ‘ a large portion of our time the past 8 weeks has been devoted to Electricity 1-7 and Electronics 1-7 ’ ’. The Authors League of America, filing here a brief as amicus, makes this interesting commentary on the record: “The astounding pattern of Publisher’s conduct, as disclosed and documented by the record, is probably without parallel in publishing history. Clearly it violates the ‘ best efforts ’ clause of the contract executed by the parties.” The record on the whole seems to justify the factual finding that the publisher did not use its “ best efforts ” on the author’s books after 1967.
On this record the court at Special Term, after a long trial, found the publisher occupied a fiduciary' relationship to the author and that there had been a failure by the publisher to act in good faith in that relationship. Accordingly it found the author was entitled to a permanent injunction restraining the publisher from proceeding with the distribution and sale of the Mileaf books, and, indeed, ordered physical destruction of these books. The court directed an accounting to the author by the publisher of the profits of the Mileaf venture and a Referee’s hearing for this purpose.
The Appellate Division, by a divided court, modified this decision in very material respects. It determined there was no fiduciary relationship between the parties but one of ordinary contract. It found there had been no breach by the publisher of the condition implicit in the contract to act in good faith; but that the publisher had breached its contractual undertaking to use its “ best efforts ” in promoting the author’s books and hence was answerable in the money damages appropriate to a breach of contract.
Consistently with this, it reversed that part of the Special Term’s order and judgment calling for a destruction of the Mileaf books and imposing a permanent injunction, and directed a hearing at the reference on the question of money damages allowing merely a temporary injunction until that question be determined. As to the ‘1 purely commercial ’ ’ nature of the relationship and as to the absence of any fiduciary obligation of the publisher, the Appellate Division expressly reversed the factual findings made at Special Term and made new findings.
*45 To decide this author-publisher controversy it is necessary to see just what the legal effect of the contract between them and the resulting relationships are, and especially what are the rights of a publisher as to the production of other works competing with the specific work of an author’s.
There is implicit in all contracts — for book publishing or house building—an implied covenant of fair dealing and good faith (Brassil v. Maryland Gas. Co., 210 N. Y. 235; Wilson v. Mechanical Orguinette Co., 170 N. Y. 542). See, also, Kirke La Shelle Co. v. Armstrong Co. (263 N. Y. 79) where Judge Htjbbs noted (p. 87) “ in every contract there exists an implied covenant of good faith and fair dealing ’ ’; and Underhill v. Schenck (238 N. Y. 7).
It has already been observed that in this contract there was an undertaking by the publisher to use its “ best efforts ” to promote the author’s works. Such a contract does not close off the right of a publisher to issue books on the same subject, to negotiate with and pay authors to write such books and to promote them fully according to the publisher’s economic interests, even though those later publications adversely affect the contracting author’s sales. This general freedom of publishing competition within the same house is demonstrated by the appellant publisher here and it is strongly argued by the Association of American Publishers, Inc. in its brief as amicus.
By analogizing the Federal cases growing out of patent and copyright licensing agreements which are governed by parallel principles, it will be observed that licensees are not deemed to limit themselves in their usual business enterprise to the promotion of the licensor’s product, absent specific agreement to this effect; and an agreement to use due diligence or best efforts does not alone limit their activity to the licensor’s interests.
This was noted by Justice Holmes in Eclipse Bicycle Co. v. Farrow (199 U. S. 581) involving a coaster brake patent license owned by one Farrow. It was observed that the licensee’s covenant “ to use due business diligence in pushing their sale, did not preclude it from using any later invention, if one were made which superseded Farrow’s, and did not embody it” (p. 589).
Thus, too, in Thorn Wire Co. v. Washburn & Moen Co. (159 U. S. 423) it was held that an agreement of a licensee to “ use *46 reasonable and diligent efforts ” to promote the barbed wire product did not impose an obligation not to sell barbed wire products under competitive patents (p. 449). Such a covenant cannot be “implied from the language used ” (p. 450). See further and consistent licensing decisions in American Mach. & Metals v. De Bothezat Impeller Co. (180 F. 2d 342, 345-346); Arnold Prods. v. Favorite Films Corp. (176 F. Supp. 862); Dwight & Lloyd Sintering Co. v. American Ore Reclamation Co. (44 F. Supp. 396).
But this general freedom of action of the publisher to produce competing works is not necessarily the answer to this litigation. Although a publisher has a general right to act on its own interests in a way that may incidentally lessen an author’s royalties, there may be a point where that activity is so. manifestly harmful to the author, and must have been seen by the publisher so to be harmful, as to justify the court in saying there was a breach of the covenant to promote the author’s work.
This, of course, is essentially a fact value question and here the Appellate Division has found that there was a narrow breach in the failure of the publisher to use its best efforts. It did not find a breach of the implied condition of fair dealing. The Appellate Division specifically found that money damages resulting from the breach of this specific undertaking by the publisher in promotion of the author’s work would afford “ adequate relief ”.
There are cross appeals on certified questions (CPLB 5602). It seems clear that such an appeal brings up only questions of law and this is what the orders of the Appellate Division allowing the appeals expressly state. Thus the only issue that may be considered in this form of appeal is whether it could be found, as a matter of law, on the record that there was no fiduciary relationship; that there was a breach of a specific undertaking of the contract; and that money damages were a sufficient measure for the breach (see Cohen and Karger, Powers of the New York Court of Appeals, § 88 el seq.) Not any of those questions requires reversal here as a matter of law.
The argument of the publisher in this court that there was no damage cannot be determined from this record as a question *47 of law. The publisher has compiled financial results from the record seeking to show the author’s royalties and the sales of its books were about the same after, as before, the Mileaf publication began.
The publisher also contends that in the 18 months before the Mileaf publication began the total sales of the author’s books were $435,000 and in a similar period after such publication for which there is evidence, the total sales were $433,600, and the total sales of both the author’s and Mileaf books $615,200. Whether there was, in fact, damage to the author from the Mileaf publication will be decided at the reference.
If the action has been properly held to be one merely for breach of contract for which money damages afford a sufficient remedy, an injunction, even temporarily for the limited time fixed by the Appellate Division until the damages, if any, are determined, would normally be inappropriate absent some showing of imminent risk of frustration of a resulting judgment, such as insolvency or siphoning off of assets. But if the hearing on damages is conducted expeditiously, the court declines to interfere as a matter of law in this respect with the discretion of the Appellate Division.
The order of the Appellate Division should be affirmed, with costs to abide the event.