John J. MELLENCAMP, p/k/a John Cougar Mellencamp, Plaintiff,

v.

RIVA MUSIC LTD., Riva Music, Inc., G.H. Music, Ltd., G.H. Music, Inc., and Avir Music, Inc., Defendants.

No. 87 Civ. 6207 (KC).

United States District Court, S.D. New York.

Nov. 2, 1988.

Elizabeth McNicoll, Stewart Levy, Parcher Arisohn & Hayes, Inc., New York City, for plaintiff.

Jane Stevens, Jonathan Davis, Gold, Farrell & Marks, New York City, for defendants.

## OPINION AND ORDER

CONBOY, District Judge:

Plaintiff John J. Mellencamp, professionally known as John Cougar Mellencamp, is a songwriter, performer, and recording artist who has enjoyed enormous success in recent years. Defendants (collectively "the Riva companies") are affiliated corporations owned and/or controlled by William A. Gaff. On May 12, 1977, Mellencamp entered into a written publishing agreement with defendant G.H. Music, Ltd. Pursuant to the 1977 agreement, Mellencamp assigned to G.H. Music the worldwide copyrights in and to the compositions to be authored by him during the term of the agreement. The 1977 agreement was modified by a written agreement, dated February 28, 1979, and by letter agreement, dated February 21, 1980. On June 15, 1981, John Cougar, Inc. entered into a written publishing agreement with defendant Riva Music, Ltd. whereby John Cougar,

Inc. assigned Mellencamp's songwriting and composing services and copyrights to Riva. On June 1, 1983, Mellencamp entered into a third publishing agreement with defendant Riva Music, Inc. Finally, by written agreement dated July 26, 1985, among Riva Music, Inc., Riva Music, Ltd., G.H. Music, Ltd, Mellencamp, and John Cougar Inc., each of the prior publishing agreements was amended in certain respects. In exchange for the assignment of the copyrights, Mellencamp received a percentage of the royalties earned from the exploitation of his music.

By virtue of the publishing agreements, according to the complaint, the Riva companies became fiduciaries for Mellencamp's interests. In his first and second claims, Mellencamp alleges that defendants breached their fiduciary duties by failing to actively promote his songs and to use their best efforts to obtain all the monies rightfully due him from third parties. In his third claim, Mellencamp contends that the Riva companies breached the various publishing agreements controlling their relationship by consistently underreporting royalties due him and by failing to timely render royalty statements and payments. In his fourth and final claim, Mellencamp contends that he entered into a binding agreement with the Riva companies pursuant to which the defendants agreed to release him from all obligations under the publishing contracts and to return all the rights to and in his musical compositions in exchange for $3 million dollars. This agreement was reached, according to plaintiff, at a luncheon meeting in a New York City restaurant among Sigmund Balaban, Mellencamp's accountant and advisor, William Gaff, and Milton Marks, Gaff's attorney. Both sides agree that the sale of the Riva companies' rights in Mellencamp's compositions was discussed, at least in general terms, at this meeting. The parties are in sharp dispute, however, over the legal consequences of their discussions.

Defendants now move pursuant to Rule 12(b)(6) to dismiss the complaint on the ground that it fails to state any valid claim for relief. Specifically, defendants contend 1) that the first two claims fail as a matter of law because no fiduciary duties are owed by a publisher to an author under a publishing agreement 2) that the third claim fails to specify which of the publishing agreements were breached, who the parties to the agreements were, and which provisions of the agreements were breached, and also fails to include a necessary party, and 3) that the fourth claim must be dismissed because the enforcement of an oral agreement to transfer copyrights is barred by § 204(a) of the Copyright Act and/or the New York Uniform Commercial Code statute of frauds § 1–206(1). In the alternative, defendants argue that they are entitled to summary judgment dismissing the fourth claim on the ground that the parties did not intend the alleged oral agreement to be binding.

## ANALYSIS

### I. Fiduciary Duties

Under New York law, the existence of fiduciary obligations in a particular relationship cannot be determined by recourse to fixed formulas or precedents:

> Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another (see *Mobil Oil corp. v. Rubenfeld,* 72 Misc.2d 392, 399–400, 339 N.Y.S.2d 623, affd. 77 Misc.2d 962, 357 N.Y.S.2d 589, revs. on other grounds 48 A.D.2d 428, 370 N.Y.S.2d 943). Such a relationship might be found to exist, in appropriate circumstances between close friends (see *Cody v. Gallow,* 28 Misc.2d 373, 214 N.Y. S.2d 127) or even where confidence is based upon prior business dealings (see *Levine v. Chussid,* 31 Misc.2d 412, 221 N.Y.S.2d 311).

*Penato v. George,* 52 A.D.2d 939, 942, 383 N.Y.S.2d 900, 904–05 (2d Dep't 1976). Notwithstanding this broad rule, defendants,

relying on *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142 (1972), *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972), argue that the relationship between an author and a publisher can never be a fiduciary relationship. *Van Valkenburgh* does not support this proposition.

There, a publisher and an author entered into a written agreement which provided, *inter alia*, that the publisher was obligated to use its best efforts to promote the author's books. *Id.*, 30 N.Y.2d at 43, 330 N.Y.S.2d at 331, 281 N.E.2d at 144. The agreement also provided that the author would receive a 15% royalty on all books sold. *Id.* The trial court found that the publisher did not use its best efforts to promote the books, the publisher occupied a fiduciary relationship to the author, and the publisher failed to act in good faith in that relationship. *Id.* at 44, 330 N.Y.S.2d at 332, 281 N.E.2d at 144. On appeal, the Appellate Division determined that no fiduciary relationship existed between the parties. *Id.* Instead, the court concluded, the relationship between the parties was one of ordinary contract. *Id.* The court also concluded that the publisher did not breach its duty of good faith but found that the publisher did breach its contractual obligation to use its best efforts to promote the author's books. *Id.* The New York Court of Appeals affirmed, concluding that "it *could* be found, as a matter of law, *on the record*, that there was no fiduciary relationship." *Id.* at 46, 330 N.Y.S.2d at 334, 281 N.E.2d at 145 (emphasis added). *See also Lane v. Mercury Record Corp.*, 21 A.D.2d 602, 252 N.Y.S.2d 1011 (1st Dep't 1964) (a royalty or percentage arrangement would not in and of itself establish a fiduciary relationship), *aff'd*, 18 N.Y.2d 889, 276 N.Y.S.2d 626, 223 N.E.2d 35 (1966). The Court did not hold that fiduciary obligations could never arise in a relationship based at least in part on publishing agreements.

■ The complaint as drafted, however, goes further than this, suggesting that fiduciary obligations attach to the publisher-author relationship as a matter of law and, consequently, that the Riva companies' alleged failure to meet their express or implied contract obligations amounts to a breach of trust. In addition, there is language in several older state cases, as well as in federal cases interpreting New York state law, that arguably supports the view that a publisher-author contract creates a "technical fiduciary relation." If these cases can be so interpreted, they are directly at odds with the greater weight of authority which teaches that the conventional publisher-author arrangement is not a per se fiduciary relationship. Commenting on the ambiguities in the caselaw, Judge Haight observed that "[t]he legal responsibilities attendant upon this status ... are far from clear." *Warfield v. Jerry Vogel Music Co., Inc.*, 1978 Copyright L.Rep. (CCH) para. 25,005, at 15,033 (S.D.N.Y. Mar. 21, 1978). These cases warrant discussion.

■ Under New York law, every contract includes an implied covenant of good faith and fair dealing which precludes a party from engaging in conduct that will deprive the other contracting party of his benefits under their agreement. *Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir.1980). A contract is also deemed to include any promise which a reasonable person in the position of the promisee would be justified in believing was included. *Rowe v. Great Atlantic & Pacific Tea Co., Inc.*, 46 N.Y.2d 62, 69, 412 N.Y.S.2d 827, 831, 385 N.E.2d 566, 570 (1978). When the essence of a contract is the assignment or grant of an exclusive license in exchange for a share of the assignee's profits in exploiting the license, these principles imply an obligation on the part of the assignee to make reasonable efforts to exploit the license. *Havel v. Kelsey–Hayes*, 83 A.D.2d 380, 382, 445 N.Y.S.2d 333, 335 (4th Dep't 1981). *See also Zilg v. Prentice–Hall, Inc.*, 717 F.2d 671 (2d Cir.1983) (promise of publisher to publish book which it has obtained exclusive rights to implies good faith effort to promote the book). The critical point here is that a publisher's obligation to promote an author's work is one founded in contract rather than on trust principles.

While it is true that several of the cases cited by plaintiff discuss certain "trust elements that are part of the relationship between a writer and a publisher," *Nolan v. Sam Fox Publishing Company, Inc.*, 499 F.2d 1394, 1400 (2d Cir.1974), it is apparent that the courts were in fact discussing a publisher's implied-in-law contract obligations or were relying on trust principles in situations where the publisher tolerated or participated in tortious conduct against the author. For example, in *Schisgall v. Fairchild Publications*, 207 Misc. 224, 137 N.Y.S.2d 312 (Sup.Ct.N.Y.Cty.1955), the plaintiff-author alleged that his publisher refused to fill existing orders for his book, withdrew his book from sale, and refused to transfer the rights to the book back to the author, all for "the single purpose to abort or destroy ... the defendant's interests." *Id.* at 232, 137 N.Y.S.2d at 319. In determining whether the alleged conduct created tort liability in addition to liability in contract, the court observed that "the intentional infliction of injury without just cause is prima facie tortious." *Id.* at 230, 137 N.Y.S.2d at 317.

As a preliminary matter, however, the court had to determine whether the plaintiff could be deemed to have suffered any injury in the absence of express contractual obligations or rights governing the complained of conduct. In response to defendants' assertion that the plaintiff retained no protectible interest in his literary product because he assigned all his rights to the defendant, the court stated:

[A]s I read the contract, even though there be an absolute assignment, there was such an assignment on the basis of the business to be done—such a transfer of rights and property to the defendant as did not denude the plaintiffs of a certain right and interest, and that arrangement resulted in that kind of relationship that *fair dealing* was required between the parties. It is not the express contractual reservation of rights per se on which plaintiffs rely, but upon the defendant's breach of the special relationship thus created—plus the defendant's intentional purpose to destroy. It is not necessary to use the magic words

of "fiduciary relationship", or to hold that a "relationship of trust and confidence" was created by the contract, or to find that defendant became a "trustee" of the copyright for the benefit of the plaintiffs (as well as of the defendant). As Chief Judge Cardozo put it in *Wood v. Lucy, Lady Duff–Gordon*, 222 N.Y. 88, 91, 118 N.E. 214: "The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. *A promise may be lacking and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed.*" Similarly, the special relationship here may not be specifically expressed, and yet the whole factual situation may be instinct with a duty which should be imposed by law upon the publisher.

*The law implies a promise on the defendant's part to endeavor to make the book and copyright productive, since that is the very purpose of the assignment of literary rights and the correlative obligation to pay royalties, In re Waterson, Berlin & Snyder Co. v. Irving Trust Co., 48 F.2d 704 [2nd Cir. 1981].*

*Id.* at 230–31, 137 N.Y.S.2d at 317–18 (emphasis added). Despite the reference to "fiduciary relationship" and "relationship of trust," it is clear, in context, that the court was talking about a publisher's implied-in-law contract obligation to use its best efforts to promote an author's work, where the publisher has exclusive rights in the work. The single case cited in the court's discussion of the "special relationship" between author and publisher, *Wood v. Lucy, Lady Duff–Gordon*, 222 N.Y. 88, 91, 118 N.E. 214 (1917) (Cardozo, C.J.), is the seminal authority on an exclusive licensee's implied promise to use reasonable efforts to generate profits from the license. The court's reliance on contract principles is confirmed later in the opinion:

*If the defendant acted merely as a contracting party (at legal liberty perhaps to breach its agreement on payment of damages), that is one thing. But if the*

defendant went further, and acted with intent to inflict injury beyond that contemplated as a result of the mere breach of contract, I would hold that the contract does not grant the defaulter immunity from tort liability. *Even though the act would not be actionable in tort if the defendant "elected" to breach its contract in furtherance of its legitimate business interests*, it is tortious (as well as a breach of contract) if there be no self-interest involved, but rather the sole purpose be that of injury to another.

*Id.*, 207 Misc.2d at 232, 137 N.Y.S.2d at 319 (emphasis added). The holding of *Schisgall* is that a publisher who breaches his implied contract obligation to exploit an author's work with no motive other than to injure the author, is liable for prima facie tort. *See Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 838 n. 7 (2d Cir.1980) ("*Schisgall ... involved the deliberate and unjustified destruction of a property right entrusted under a contract*").

Relying on the two paragraphs from 207 Misc.2d at pages 230–31, 137 N.Y.S.2d at 317–18 of *Schisgall* quoted above, the court in *Manning v. Miller Music Corp.*, 174 F.Supp. 192, 195–96 (S.D.N.Y.1959), characterized the relationship between publisher and author as one involving fiduciary obligations. But as in *Schisgall*, the court did not hold that the publisher's breach of contract obligations gave rise to liability as a fiduciary, nor was such liability even at issue. The question in *Manning* was whether the plaintiffs, composers of a song who assigned their copyrights to a publisher, had standing to maintain a suit for infringement against a third party. *Id.* at 194. The court concluded that the "peculiar relationship between the author and his publisher," *id.* at 195, gives the authors standing to bring suit against a third party infringer when the publisher fails to do so. "It is this fiduciary relationship imposing

equitable obligations upon the publisher beyond those ordinarily imposed by law upon those dealing fully at arms' length, which gives the plaintiffs standing to sue here." *Id.* at 196. Analogizing the situation to a stockholder's derivative action, *id.* at 196, the court reasoned that plaintiffs could maintain the infringement action as long as the publisher was joined as a nominal defendant. *Id.* Notably, the court concluded that it would be inappropriate to force plaintiffs to institute "a separate action in *contract* against the publisher" to achieve the same end. *Id.* at 197 (emphasis added). *See also Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir.1984) (when a composer assigns a copyright title to a publisher in exchange for the payment of royalties, an equitable trust relationship is established between the two parties which gives the composer standing to sue for infringement of the copyright). In a similar vein, the court in *Nelson v. Mills*, 278 A.D. 311, 104 N.Y.S.2d 605 (1951), *aff'd*, 304 N.Y. 966, 110 N.E.2d 892 (1953), held that a publisher's actual promotion of a song which infringed the author's was a "breach of contract or trust." *Id.* at 312, 104 N.Y.S.2d at 606. But the court also asserted, echoing *Schisgall*, that "the defendant was not obligated to promote the sale of plaintiff's song." *Id.* at 312, 104 N.Y.S.2d at 607.[1]

■ To the extent the cases discussed above intended to posit a per se rule that a publisher with exclusive rights in a work is a fiduciary for the author's interests, they must be rejected as inconsistent with *Van Valkenburgh*. The better view, and the one consistent with *Van Valkenburgh*, is that the "trust elements" in a publisher-author relationship come into play when the publisher tolerates infringing conduct, *Manning, Cortner*, or participates in it, *Nelson v. Mills*. Ordinarily, however, the express and implied obligations assumed by a publisher in an exclusive licensing contract are not, as a matter of law, fiduciary duties. *See Sobol v. E.P. Dutton, Inc.*, 112

---

1. *Broadcast Music v. Taylor*, 10 Misc.2d 9, 55 N.Y.S.2d 94 (Sup.Ct.N.Y.Cty.1945) relied on by Mellencamp, is distinguishable from the author/publisher contract cases. Although the contracts at issue there involved the granting of

licenses in exchange for royalties, the court found under the unique circumstances of the case that the litigants were joint venturers with concomitant fiduciary obligations to each other. *Id.* at 18, 55 N.Y.S.2d at 102–03.

F.R.D. 99, 104 (S.D.N.Y.1986) (Weinfeld, J.); *Ekern v. Sew/Fit Company, Inc.*, 622 F.Supp. 367, 373 (N.D.Ill.1985) (citing *Van Valkenburgh*). *Cf. Beneficial Commercial Corp. v. Murray Glick Datsun*, 601 F.Supp. 770, 772 (S.D.N.Y.1985) (absent assumption of control or responsibility and corresponding repose of trust, arm's length business transaction does not give rise to fiduciary relationship). Accordingly, since plaintiff's first two claims are predicated solely upon the professional relationship between the parties and do not plead any specific conduct or circumstances upon which trust elements are implicated, they are dismissed. In the unlikely event that plaintiff can repair his pleadings in this regard, he is given leave to replead within twenty days of the date of this order.

## II. Breach of Contract.

■ Defendants contend that the third claim for breach of contract should be dismissed because it fails to specify the contracts and specific contract provisions at issue in the lawsuit. The Court disagrees. It is now axiomatic that a complaint need only provide " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." 2A J. Moore, Moore's Federal Practice para. 8.13 at 8–62 (2d ed. 1987). The present complaint clearly satisfies this minimal requirement. Defendants' motion to dismiss demonstrates their awareness of the contracts at issue in this case, and the alleged breach—defendants' failure to fully and timely report royalties—is more than sufficient to put defendants on notice of the claims against them. The two cases relied on by defendants on this leg of their motion are wholly inapposite to the case at bar.

In *Nordic Bank P.L.C. v. Trend Group*, 619 F.Supp. 542 (S.D.N.Y.1985), the complaint alleged only that certain agreements between the parties had been breached. *Id.* at 562. The pleadings were bereft of any reference to a specific promise or the nature of defendant's failure to meet its obligations. *Id.* The court ruled, quite reasonably, that such a "conclusory allega-

tion provide[d] insufficient notice of the facts underlying the breach of contract claim." *Id.* at 562. In *Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 353 (7th Cir.1982), the complaint lacked even the conclusory allegation of a breach found in *Nordic Bank*. *Id.* at 351. Instead the plaintiffs argued, in response to defendant's motion to dismiss, that such a claim was "implicitly alleged in the complaint." *Id.* Even under those circumstances, the court did not dismiss plaintiff's argument out of hand but concluded that the complaint did not plead facts sufficient to notify defendants of a contract claim. *Id.* at 352. The instant complaint is simply not comparable to the inscrutable pleadings in *Nordic Bank* and *Murphy*.

■ The Court does, however, agree that defendants Avir Music, Inc. and H.G. Music, Inc. must be dismissed from the complaint. Mellencamp alleges that he entered into agreements with defendants G.H. Music Ltd., Riva Music, Ltd., and Riva Music Inc. "Before [a] defendant may be held accountable for the breach of a contract, it must be demonstrated that he was a party thereto." *Stratton Group, Ltd. v. Sprayregen*, 458 F.Supp. 1216, 1218 (S.D.N.Y. 1978). Avir Music, Inc. and H.G. Music, Inc. are not alleged to be parties to the publishing agreements and thus the pleadings do not provide any basis upon which relief could be granted against these defendants. *See id.; Franklin v. Carpinello*, 84 A.D.2d 613, 613, 444 N.Y.S.2d 248, 249 (3d Dep't 1981). The Court is unaware of any authority, and plaintiff has not offered any, to support plaintiff's assertion that these two defendants may be liable for the breach of a contract which they are strangers to simply because they share the same director and/or owner as the other corporate defendants or because they assisted the other corporate defendants in the "administration of the Mellencamp publishing agreements." Plaintiff's Memorandum at 11. Plaintiff's third claim is dismissed as against Avir Music, Inc. and H.G. Music, Inc. with leave to replead within twenty

days of the date of this order.[2]

Defendants contend that the third claim is defective, at least with respect to the publishing agreement dated June 15, 1981, because John Cougar Inc. and not Mellencamp is the party to that contract.[3] As Judge Stanton has observed, "[i]n order to state a contract claim a plaintiff must at least allege either that he was a party to a valid contract ... or that he was an intended beneficiary of a contract between the defendant and a third party." *Tampa Chain Company of Providence, Inc. v. Odena Marketing International Corp.,* No. 84 Civ. 0707, slip op. at 2 (S.D.N.Y. April 3, 1986) [available on WESTLAW, 1986 WL 4066] (Lexis Genfed Library, Dist. File). Although under New York law, an agent can maintain an action in his own name *on behalf of his principal,* he can only do so if he is a party to the contract, a transferee, or a holder of an interest in the contract. *Colonial Securities, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 461 F.Supp. 1159, 1165 (S.D.N.Y.1978); *In re Best Film v. Video Corp.,* 46 B.R. 861, 876 (E.D.N.Y.1985). While Mellencamp may in fact have no rights under the 1981 agreement, this issue cannot be resolved on the face of the pleadings since the complaint, construed broadly, asserts that Mellencamp is a party to or an intended beneficiary of all relevant publishing agreements. Because defendants have submitted matters outside of the pleadings, specifically the 1981 contract, it is appropriate to treat this leg of the motion as one for partial summary judgment. Fed.R.Civ.P. 12(b)(6). Plaintiff shall, within twenty days of the entry of this order, submit evidence on the issue of his rights under the 1981 agreement.

**2.** Because the complaint is defective on its face, it is unnecessary to rely on additional materials submitted to the Court. I note, however, that defendants have submitted copies of the publishing agreements in support of their argument that G.H. Music Inc. and Avir Music, Inc. are not parties thereto. In point 1 of his Rule 3(g) statement, Mellencamp avers the existence of a genuine issue as to whether these two defendants did in fact enter into publishing agreements with him, but this assertion is not supported by any evidence. Should Mellencamp amend his complaint to allege that G.H. Music

## III. Statute of Frauds.

The Statute of Frauds provision of the Copyright Act, 17 U.S.C. § 204(a), provides:

A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

According to defendants, § 204(a) bars plaintiff's fourth claim which, they argue, alleges the existence of an oral agreement to transfer to him the copyrights in his compositions. Defendants also rely, in the alternative, on § 1–206(1) of the New York Uniform Commercial Code which provides:

[A] contract for the sale of personal property is not enforceable by way of action or defense beyond five thousand dollars in amount or value of remedy unless there is some writing which indicates that a contract for sale has been made between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought or his authorized agent.

With respect to the Copyright Act, Mellencamp attempts to draw a distinction between cases where the validity of a purported oral transfer is at issue and cases where, as here, an oral agreement to transfer a copyright is sought to be enforced. The Copyright Statute of Frauds only applies to the former, according to Mellencamp. He also makes the unrefuted observation that the writing confirming the transfer of a copyright license can be executed after the transfer. *See Eden Toys,*

Inc. and Avir Music, Inc. are parties to some or all of the publishing agreements, defendants are free to renew their attack on this claim in a motion for summary judgment.

**3.** Defendants also contend that John Cougar Inc.'s absence as a party precludes any recovery by Mellencamp with respect to contracts entered into between himself, John Cougar, Inc., and the defendants. No legal authority has been cited in support of this argument and it will not be considered at this time.

*Inc. v. Florelee Undergarment Co., Inc.,* 697 F.2d 27, 38 (2d Cir.1982).

Turning first to the applicability of the statute of frauds, the cases do not support Mellencamp's restrictive reading of § 204(a). In *Library Publications, Inc. v. Medical Economics Co.,* 548 F.Supp. 1231 (E.D.Pa.1982), *aff'd,* 714 F.2d 123 (3d Cir. 1983), a trade book publisher sued another publisher charging, *inter alia,* that the defendant breached an oral contract to grant plaintiff the right to distribute a certain book. *Id.* at 1232. Because § 204(a) requires such agreements to be in writing, the court granted summary judgment dismissing the complaint. *Id.* at 1234. *See also* 3 Nimmer, On Copyright § 10.03[a] at 10–34 n. 5.1 (1988) (the writing requirement of § 204(a) is significant in actions for breach of contract as well as in actions for copyright infringement). Moreover, Mellencamp's cramped interpretation of § 204 is inconsistent with the underlying purpose of the statute of frauds which is "to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses." *Eden Toys, Inc.,* 697 F.2d at 36. Thus there is no merit to plaintiff's contention that a contract to transfer a copyright can be enforced without a writing.

■ Plaintiff attempts to avoid the U.C. C. statute of frauds by arguing that the principal asset to be transferred pursuant the oral agreement was Mellencamp's services as a songwriter rather than the copyrights and thus the agreement "cannot be characterized as merely a 'sale' of copyrights." Plaintiff's Memorandum at 16. Though not stated, it is implied that the statute of frauds is inapplicable to a contract which subject matter falls, in part, outside the scope of the statute. Plaintiff's Memorandum at 15. Plaintiff also contends that § 1–206 is inapplicable to a sale of copyrights. Neither assertion is correct.

First, the single case relied on by plaintiff for the partial-sale argument is inapposite to the present facts. In *Lee v. Joseph E. Seagram & Sons, Inc.,* 413 F.Supp. 693 (S.D.N.Y.1976), the alleged oral contract did not involve the sale of personal property at all. *Id.* at 704. Although no authori-

ty is presented on the point by either side, plaintiff's partial-sale argument does beg the question of whether a contract is unenforceable in its entirety where certain terms of the agreement fall within the statute of frauds and others without. The general rule in New York is:

> if part of an entire contract is void under the Statute of Frauds, the whole of such contract is void (*De Beerski v. Paige,* 36 N.Y. 537, 539). Where however, a parol contract is a severable one, *i.e.,* susceptible of division and apportionment, having two or more parts not necessarily dependent upon each other, those which, if standing alone, are not required to be in writing, may be enforced (*see, Markey v. Kelly,* 10 A.D.2d 650, 651, 197 N.Y.S.2d 891; 56 N.Y.Jur., Statute of Frauds, §§ 322–325, 329).

*Dickenson v. Dickenson Agency, Inc.,* 127 A.D.2d 983, 984, 512 N.Y.S.2d 952, 953 (4th Dep't 1987). In *Dickenson,* the plaintiff was employed by the defendant as an insurance salesman. The complaint alleged the existence of an oral agreement containing three distinct parts. First, that plaintiff was entitled to commissions on initial policy sales and subsequent renewals. Second, that he was entitled to renewal commissions even when the renewal took place after his termination. And third, that he was entitled to bonus payments. *Id.* at 983–84, 512 N.Y.S.2d at 952–53. The court found that the provision granting plaintiff the right to commissions on sales and renewals occurring before his termination were severable, and thus enforceable, from the provision granting post-termination rights which was void under the statute of frauds. *Id.* at 984, 512 N.Y.S.2d at 953. Here the package of rights to be transferred to Mellencamp under the alleged oral agreement was to be exchanged for the single lump sum of $3 million dollars. Although plaintiff has argued that the non-copyright aspects of the agreement are worth a great deal more to him than the copyrights themselves, plaintiff has not attempted apportionment of the $3 million dollars to the various rights in the agreement nor does the contract contain separate parts susceptible to severance.

■ Finally, with respect to the U.C.C. statute of frauds, Mellencamp reasons that copyright sales must be excluded from the purview of § 1–206 because a) the section governs the sale of general intangibles b) the Official Comment to the section refers to Article 9 for the definition of general intangibles and c) Article 9 is supposedly pre-empted by the Copyright Act. The Official Comment to § 1–206 indicates that the section governs the sale of "general intangibles" as defined in U.C.C. § 9–106, and the Official Comment to § 9–106 in turn lists rights to performance and copyrights as examples of "general intangibles." Article 9, which governs secured transactions, by its terms does not apply to:

> a security interest subject to any statute of the United States to the extent that such statute governs the rights of parties to and third parties affected by transactions in particular types of property.

§ 9–104(a). Assuming that this provision excludes security interests in copyrights from Article 9 [4], it does not follow that a copyright is not a "general intangible" the sale of which is governed by the U.C.C. statute of frauds. The Official Comment to § 1–206 provides that it applies to "general intangibles" as defined in Article 9 *and* to transactions *excluded* from Article 9 by § 9–104. In other words, exclusion under § 9–104 means inclusion under § 1–206.

Notwithstanding the application of the statute of frauds to the alleged contract, it is impossible to determine from the face of the pleadings whether Mellencamp can prove no set of facts in support of his claim that would entitle him to relief. *See* E. Farnsworth, Contracts § 6.10 at 427 (1982) (plaintiff need not allege facts showing that statute was satisfied). The complaint would be subject to a motion to dismiss if it showed on its face that the contract sued upon is within the statute *and* that the statute has not been satisfied, *id.*, but the complaint does not reveal whether the agreement to transfer the rights under the publishing agreements was oral or otherwise lacking a confirmatory memorandum. Although the statute of frauds issue overlaps, to some extent, the arguments advanced by defendants in their motion for summary judgment, and defendants have established that no written agreements were entered into for the sale to Mellencamp of the Riva copyrights [5], they have not addressed the possibility that a note or memorandum executed after the luncheon meeting satisfies the statute of frauds.

■ To satisfy the statute, a memorandum or note signed by the party to be charged need only:

> (1) identify the parties to the contract and show that a contract has been made by them or offered by the signatory to the other; (2) indicate the nature of the contract and its subject matter; (3) state the essential terms of the promises to be performed under the contract.

E. Farnsworth, Contracts § 6.7 at 409 (1982). Although a dispositive ruling on the statute of frauds question is thus inappropriate, and unnecessary for reasons discussed below, one observation is in order. In response to defendant's summary judgment motion, Mellencamp has submitted certain letters that allegedly evince the Riva companies' acknowledgement of a binding agreement on all material terms. One letter, dated April 10, 1987, was written by Richard Parrington of Riva to Gaff's attorney, Gary Baker. Commenting on a document request received from Mellencamp's attorney, Henry Goldstein, in

---

**4.** Apparently it does not:

Although the Federal Copyright Act contains provisions permitting the mortgage of a copyright and for the recording of an assignment of a copyright ... such a statute would not seem to contain sufficient provisions regulating the rights of the parties to exclude security interests in copyrights from the provisions of this Article.

Official Comment to § 9–104(a).

**5.** Despite Mellencamp's assertion, in his Rule 3(g) statement, that the existence of a written agreement is a genuine issue of material fact, no evidence has been submitted on this point. In his memorandum of law, plaintiff apparently concedes the absence of a written agreement, limiting his argument to whether the parties intended "to be bound to the oral agreement." Memorandum at 18.

connection with his due diligence investigation for the deal, Parrington asserts that most of the requested documents had already been supplied to Mellencamp's representatives or were not relevant. A copy of this letter was sent to Balaban with a cover note from Parrington urging Balaban to "keep the legal bills down." To the extent that these letters have been offered or would be offered to satisfy the statute of frauds, they do more harm than good for Mellencamp's position.

For one thing, Parrington refers to the copyright sale as a "proposed deal" in his letter to Baker. Parrington also opines that certain documents requested by Goldstein "are irrelevant to the current negotiations" and specifically asserts that earnings on unrecouped balances from sub-publishers "would have to be [the] subject of negotiation." In addition, none of the documents submitted are alleged to state the essential terms of the agreement. Where the memorandum offered to satisfy the statute of frauds contains a provision or understanding that a more formal contract is to be executed later and leaves material terms to be negotiated or omits them, the memorandum is insufficient. *Read v. Henzel*, 67 A.D.2d 186, 189, 415 N.Y.S.2d 520, 523 (4th Dep't 1979). These letters are thus consistent with defendants' position that a binding agreement would come into existence only upon the execution of a formal contract.

## IV. Absence of a Binding Agreement.

■ Lastly, defendants argue that summary judgment should be entered dismissing Mellencamp's fourth claim on the ground that the parties did not enter into a binding agreement for the sale of Mellencamp's copyrights and his songwriting services. Plaintiff, of course, resists that argument, and contends that the issue is one of fact, turning largely on determinations of credibility, which precludes summary judgment "as a matter of judicial policy." Plaintiff's Memorandum at 21.[6] The Court disagrees with plaintiff on both points. While the intent of the parties to be bound is a question of fact, the issue is not immune from disposition on summary judgment, and summary judgment is appropriate in this case.

In *Scheck v. Francis*, 26 N.Y.2d 466, 311 N.Y.S.2d 841, 260 N.E.2d 493 (1970), the former personal business manager of the popular singer Connie Francis brought suit against her and her three business corporations alleging that defendants breached certain written employment agreements governing their relationship. The contracts sued upon were drafted following negotiations between plaintiff and Francis' attorney, Marvin Levin.[7] During the course of negotiations, Levin submitted several drafts of proposed contracts to plaintiff all of which were rejected. *Id.* at 469, 311 N.Y.S.2d at 842, 260 N.E.2d at 494. After the final negotiating session, Levin sent plaintiff four unsigned agreements in quadruplicate. The agreements were accompanied by the following cover letter:

> Dear George:
>
> Enclosed ... are the employment agreements between you and GGC Productions Corp., Connie Francis, Antigony Music Ltd., and Brookings Music Inc. Please sign all copies, have Connie sign all copies and distribute the copies as follows:
>
> > One set to me
> >
> > One set for the office
> >
> > One set for you
> >
> > One set for Sol Granett [Plaintiff's attorney]
>
> If you have any questions or comments, please call me.

---

**6.** In a footnote at the end of his memorandum of law, plaintiff also asserts that summary judgment is premature where no discovery has taken place. Since plaintiff has neither submitted an affidavit, pursuant to Fed.R.Civ.P. 56(f), stating why he cannot present facts essential to justify his opposition, *See* 6 J. Moore, Moore's Federal Practice para. 56.24 at 56–791 to 94 n. 8

(2d ed. 1988), nor given any indication of the relevant facts to be learned through discovery, this argument is without merit.

**7.** The negotiations were prompted by the expiration of an earlier employment contract. *Id.* at 468, 311 N.Y.S.2d at 842, 260 N.E.2d at 494.

*Id.* at 469 n. 1, 311 N.Y.S.2d at 842 n. 1, 260 N.E.2d at 494 n. 1. Plaintiff signed the agreements but Francis did not. Nonetheless, plaintiff continued to work for Francis for almost a year, after which he was informed that no contract existed between himself and Francis. *Id.* at 469, 311 N.Y.S.2d at 842–43, 260 N.E.2d at 494.

In reviewing the trial court's dismissal of the complaint, the Court of Appeals observed that "if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed." *Id.* at 469–70, 311 N.Y.S.2d at 843, 260 N.E.2d at 494. Applying this principle, the Court found it to be:

> quite clear, from Mr. Levin's letter alone, that the agreements were to take effect only after both parties had signed them. Thus, he had instructed the plaintiff that he was to sign them and "have Connie sign" them, expressly advising to call if there were "any questions or comments". Although the agreements themselves were not required to be delivered to the plaintiff's attorney ... before the parties had signed, a copy of the covering letter was sent to him. This combination of circumstances unquestionably gave the plaintiff an opportunity to decline to go through with the deal before he signed. Certainly, the defendant Francis enjoyed the same privilege, and she never did sign. In short, both parties must plainly have understood that the agreements were to take effect only after they had signed them and, until that time, the matter was still in the stage of negotiations.

*Id.* at 470, 311 N.Y.S.2d at 843, 260 N.E.2d at 494–95. *See also Schwartz v. Greenberg,* 304 N.Y. 250, 107 N.E.2d 65 (1952).

The mutual lack of intent to be bound absent an executed contract is, if anything, clearer here than it was in *Francis.* On or about April 1, 1987, Gary Baker received a letter from Henry Goldstein requesting certain documents in connection with his due diligence investigation of the proposed sale. The letter provided as follows:

> I enclose a preliminary Document Request List in connection with our *preparation* of an agreement pursuant to which, among other things, John Mellencamp *will* effect the cancellation of his songwriter agreements with Riva Music, et al.
>
> Please note that the Document Request List is designed for our due diligence investigation and evaluation and accordingly, is intended to be illustrative rather than exhaustive. It is expected that, during the course of our review of the materials and our *preparation* of the agreement, we will make requests for additional information.

(emphasis added). On April 27, Baker received a draft agreement from Goldstein accompanied by a letter which stated:

> I enclose a *draft* of the *proposed* agreement between John J. Mellencamp and Riva Music pursuant to which, among other things, John Mellencamp *will* effect the cancellation of his songwriter agreements with Riva Music, et al.
>
> Under separate cover, I will shortly be sending you the various Exhibits to the *proposed* agreement. I would appreciate it if, while you are reviewing the *proposed* agreement, you prepare the Schedules to the *proposed* agreement and forward same to me.
>
> *As soon as you have reviewed the proposed agreement, please call me.*
>
> Please note that I am simultaneously sending a copy of the *proposed* agreement to our client for *review; therefore, I must reserve the right to make any changes which it may require.*

(emphasis added). Finally, in a letter sent to Mellencamp by Balaban on April 21, 1987, more than a month after the allegedly binding luncheon agreement, Balaban states:

> I have been in frequent communication with Hank Goldstein regarding the *proposed* contract with Riva Music Ltd. and its associated entities.
>
> In that connection Hank forwarded to me a *preliminary draft* dated April 16, 1987 for my comments. *I suggested to Hank that he delete certain words on*

*page 1 of the draft because they do not appear to me to be necessary, and may result in a hostile reaction from Gaff....*

*I have also indicated to Hank that while Gaff and his companies should release you from all obligations under the prior agreements, there does not appear to me to be any reason for you to release Gaff et al from anything,* except acting as your publisher. This is of course the lawyer's domain.

(emphasis added). As a general observation, the evidence of the tentative nature of the agreement can only be described as manifest, especially in comparison to *Francis*. This conclusion is further confirmed by analyzing the evidence under the four factor test set forth in two recent decisions by the Second Circuit. The factors are 1) whether there has been an express reservation of the right not to be bound absent a writing 2) whether there has been partial performance of the alleged contract 3) whether all of the terms of the contract have been agreed upon,[8] and 4) whether the contract concerns complex and substantial business matters that would not ordinarily be the subject of an oral agreement. *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985); *R.G. Group, Inc.*, 751 F.2d at 75–76. The evidence on each of the four factors weighs conclusively in defendants' favor.

### a) Express Reservation

As already noted, Goldstein informed Baker that he reserved the right to make *any* changes in the contract following Mellencamp's review of the first draft and without exception referred to the draft as a proposed agreement. *Cf. Winston*, 777 F.2d at 81 (although neither party expressly reserved right not to be bound, reference in correspondence of parties to the "proposed settlement" and to "consummation of proposed settlement" revealed such an intent). In addition to the Goldstein letter, the proposed agreement itself, which was drafted by Mellencamp's lawyer, confirms that the agreement would only be binding upon execution:

NOW THEREFORE, the parties hereto agree as follows:

FIRST: *Release, Transfer and Payment.* Contemporaneously with the execution and delivery of this Agreement on this ___ day of ___, 1987 (the "Closing Date") and in full consideration of the releases, transfers, assignments and agreements provided in this Article FIRST and the remainder of this Agreement, Mellencamp is herewith delivering to the Publishers ... THREE MILLION DOLLARS ... receipt of which is hereby acknowledged by the Publishers, and in consideration thereof:

A. The Publishers, jointly and severally, agree that (i) the term of the Publishing Agreement and each other Prior Agreement that has not expired and has not been terminated prior to the Closing Date shall be terminated *as of the closing date....*

B. All prior or contemporaneous agreements, contracts, promises, representations and statements, if any, between the parties hereto, or their representatives, as to the subject matter hereof, are merged into this Agreement ... and this Agreement and the Schedules and Exhibits hereto shall constitute the entire agreement between them. This Agreement ... constitutes the entire understanding between the parties and no waiver or modification of the terms hereof shall be valid unless in writing signed by the party to be charged and only to the extent therein set forth.

(emphasis supplied emphasis added). In addition to the payment of the purchase price, other key provisions in the draft agreement, including the termination of the existing publishing agreements, assignment of the copyrights, assignment of third-party contracts, termination of defendants' rights in Mellencamp's likeness, voice, and sound, appointment of Mellen-

---

**8.** It should be noted, however, that "if the parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs.... even if the parties have orally agreed upon all the terms of the proposed contract." *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984)

camp as attorney-in-fact over the rights transferred, and the payment to Mellencamp of royalties received after a specified date, are triggered only by the execution of a final agreement. The tenor of the draft agreement is wholly inconsistent with the notion that it would constitute a mere memorialization of a prior binding oral agreement. *Cf. R.G. Group, Inc.*, 751 F.2d at 76 (where contract on its face declared that it would set forth the parties rights and obligations "when duly executed" and that there was no other agreements between the parties, the parties were not bound until such execution took place).

Further confirming the absence of a binding agreement under this factor, as well as providing an independent basis for dismissal of the fourth claim, is the presence, in 3 of the 4 publishing agreements, of "no oral modification" clauses, "no oral cancellation" clauses, or both. New York General Obligations Law § 15–301 gives effect to contract provisions that prohibit oral modification or termination. Section 15–301 can be avoided where there has been part performance of or substantial reliance on the oral modification if either action is "unequivocally referable to the oral modification," *Rose v. Spa Realty Assoc.*, 42 N.Y.2d 338, 343–44, 397 N.Y.S.2d 922, 926–27, 366 N.E.2d 1279, 1282–84 (1977), but neither circumstance is alleged to be present here.

b) Partial Performance.

Mellencamp has not alleged that performance, partial or otherwise, has taken place on either side.

c) Terms Left to be Agreed Upon.

According to Balaban, it was agreed at the luncheon meeting that the copyrights to be transferred were free of financial encumbrances; that Mellencamp was the sole composer of most of the musical compositions covered by the copyrights; that all mutual outstanding obligations between Mellencamp and defendants would survive the closing; and that a closing date of no later than June 30, 1987 was anticipated. These, Balaban asserts, were all the material terms of the agreement. The draft agreement, however, which defendants accurately describe as a "17 page, highly dense, and technical contract," Baker Affidavit at 10, is much broader in scope. For one thing, defendants' rights to Mellencamp's services as a songwriter is not mentioned by Balaban as a specific agreed upon term although elsewhere in his affidavit he describes such rights as representing the lion's share of the value of the publishing contracts. Yet those rights are addressed at length in the draft agreement. Also present in the draft agreement, but conspicuously absent from Balaban's affidavit, are sweeping warranties and indemnifications running from defendants to Mellencamp and covenants giving Mellencamp the sole discretion to assume or terminate agreements which defendants had with third parties. Under the circumstances, it can hardly be said that "there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to." *R.G. Group, Inc.*, 751 F.2d at 76.

d) Scope and Complexity of the Alleged Oral Agreement.

Here again, the draft agreement speaks for itself, consisting of 17 single typed pages containing numerous representations, guarantees, warranties and covenants. One can also infer, from the non-exclusive list of documents sought by Goldstein from Baker in connection with his due diligence investigation more than two weeks after the allegedly binding handshake agreement, that significant information, upon which Mellencamp would undoubtedly base his decision to be bound, was not known at the time of the luncheon meeting. Goldstein sought, among other things, a list of all Mellencamp compositions subject to agreements between Mellencamp and the Riva companies; all agreements, contracts, and licenses for the exploitation of Mellencamp's compositions, including sublicenses, mechanical licenses, performing rights and administrative contracts; a summary of all pending litigation relating to the compositions; copies of all royalty statements; and all contracts that

could have an effect on the publishers' rights in and to the compositions. In addition to indicating that material facts were not known at the time of the luncheon meeting, the nature of the inquiry, a due diligence investigation, is inexplicably inconsistent with the pre-existence of a binding deal. If Mellencamp could not withdraw from the deal or alter it in any material way based on information discovered through the due diligence investigation, it is not clear why such an investigation would go forward. Finally, the fact that the proposed purchase price was $3 million dollars strongly supports the inference that a written agreement was contemplated. *Cf. R.G. Group, Inc.*, 751 F.2d at 77 (where contract covered detailed business matters, parties discussed initial investment of $2 million, and plaintiff alleged damages of at least $80 million, agreement was not one which would ordinarily be relied upon without a writing); *Winston*, 777 F.2d at 83 (although agreement was only 4 pages parties thought terms and language used were complex enough to require substantial redrafting, and $62 thousand at issue in lawsuit was not a trifling amount). The Court concludes that the overwhelming and uncontradicted evidence demonstrates that the parties never entered into a binding agreement.

I note, as a final matter, that Mr. Balaban devotes 2 sentences in his 6 page affidavit to the question of the parties intent to be bound by the agreement reached at the luncheon meeting:

> At the conclusion of the meeting Milton Marks, William Gaff and I joined hands and Milton Marks solemnly stated

the Hebrew words "Mazel Bracha" which literally means "good fortune and blessing" and which are customarily said in some circles to evidence a firm agreement. I am also aware that in the entertainment business handshake agreements, particularly where there have been extensive negotiations prior to the agreement, are honored and binding.

These wholly ephemeral assertions are inadequate as a matter of law. First and foremost, even if Marks was a member of one of the unidentified "circles," his statement does not provide a basis to avoid N.Y.Gen.Oblig.L. § 15–301. Second, while on summary judgment "doubts must be resolved in favor of the party opposing the motion, the opposing party must provide 'concrete particulars' showing that a trial is needed, and '[i]t is not sufficient merely to assert a conclusion without supplying supporting arguments or facts in opposition to that motion.'" *R.G. Group, Inc.*, 751 F.2d at 77. The plaintiff in *R.G. Group* asserted that defendant's representative assured him that they had "a handshake deal today and right now." *Id.* at 76. Although the Court concluded that the evidence "might, in a different context, have indicated some doubt about the writing requirement," the reference to a handshake deal could not overcome the parties' repeated expressions of the need for a writing and the absence of any express waiver of the writing requirement. *Id.* The statement relied on by plaintiff here is far less concrete than the admission of a "handshake deal" in *R.G. Group, Inc.*,[9] and the evidence need for a writing is at least as compelling here.

---

9. On the question of intent, Balaban's affidavit is notable for what it does not say:

> Under New York law, what is looked to in determining whether an agreement has been reached is not the parties' after-the-fact professed subjective intent, but their objective intent as manifested by their expressed words and deeds at the time; if the parties' expressions and conduct would lead a reasonable person to determine that they intended to reach a binding agreement, their agreement will be enforced.

*Reprosystem, B.V. v. S.C.M. Corp.*, 522 F.Supp. 1257, 1275 (S.D.N.Y.1981) *aff'd in part rev'd in part on other grounds*, 727 F.2d 257, *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54

(1984). Balaban does not say that he understood Marks to be expressing an intention to be bound at the time, or that Marks was a member of one of the unidentified "circles," or even that he was aware at the time of the customary meaning of "Mazel Bracha." Most striking, Balaban never asserts that *he* expressed any intention to be bound at the luncheon meeting.

The source of Balaban's knowledge of entertainment industry customs is also a mystery. Unlike Balaban, Henry Goldstein states, in his affidavit, that he "has over ten years experience in the entertainment business and as an attorney [has] concentrated on contracts in the music and recording industry." Yet Goldstein does

Accordingly, plaintiff's fourth claim is dismissed. Plaintiff's third claim as against defendants Avir Music, Inc. and H.G. Music, Inc. is dismissed with leave to replead within twenty days of the date of this order. Plaintiff's first and second claims are also dismissed with leave to replead within twenty days of the date of this order. Plaintiff shall, within twenty days of the date of this order, submit materials in opposition to defendants' motion for partial summary judgment dismissing that part of the third claim predicated upon the 1981 publishing agreement.

SO ORDERED.

not corroborate Balaban's opinion about con- tract practices in the entertainment industry.