In re THOMSON McKINNON SECURITIES, INC., Thomson McKinnon Inc. and Realty International Corporation, Debtors.

Bankruptcy Nos. 90 B 10914, 90 B 11805 and 90 B 13820.

United States Bankruptcy Court, S.D. New York.

Dec. 29, 1992.

Debevoise & Plimpton, New York City, for debtors.

Healy & Baillie, New York City, for Robert M. Kimball.

Salomon Green & Ostrow, P.C., New York City, for Amorose, Barnes, Conley and Lynch.

W. Gregory Robertson, pro se.

David T. Eames, New York City, Bodian & Eames, for David Vogel.

Stroock & Stroock & Lavan, New York City, for the Creditors' Committee.

## DECISION ON MOTION AS TO SENIOR OFFICERS' AND DIRECTORS' CLAIMS

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The Chapter 11 debtor, Thomson McKinnon Securities, Inc. ("TMSI"), objects to the claims filed by seven former directors and executive officers on the ground that it has no liability for their contractual employment and fringe benefit claims because their claims should be borne solely by TMSI's parent corporation, Thomson McKinnon Inc. ("TMI"), which is also a Chapter 11 debtor. Unlike TMSI, which denies liability for these claims, TMI admits liability to each claimant, but objects to the amounts sought as excessive. Significantly, the parent corporation, TMI, is a holding company with minimal liquid assets and dependent upon the operations of its subsidiaries, whereas TMSI, the operational subsidiary, has sufficient assets to warrant a substantial distribution to its creditors.

## FINDINGS OF FACT

1. On March 28, 1990, the debtors, TMI and TMSI, filed with this court their petitions for reorganizational relief under Chapter 11 of the Bankruptcy Code and continued in business as debtors in possession in accordance with 11 U.S.C. §§ 1107 and 1108.

2. TMSI is a Delaware corporation based in New York City and was engaged in business as a securities firm and a registered broker dealer. As a registered broker dealer, TMSI was a highly regulated entity. It was subject to stringent requirements regarding maintenance of sufficient "net capital" to protect its customers.

3. TMI is the parent holding corporation for TMSI and other subsidiaries. TMI was formed in 1976 as a privately owned company, formed to permit the firm to diversify into other businesses without violating rules and regulations applicable to TMSI as a registered broker dealer. Directors of TMI were also directors of TMSI. But many of the directors of TMSI were not directors of the parent, TMI. Each corporation maintained separate bank accounts, ledgers and separate financial documents. All of the claimants except James C. Barnes ("Barnes") were not directors of TMI. Barnes was a director of both TMI and TMSI. The Boards of Directors of TMI and TMSI each delegated their powers to separate executive committees. In the early 1980s the TMI Board of Directors approved a package of fringe benefits that TMI would make available, on standard terms, to members of the executive committees of both TMI and TMSI. These benefits were as follows:

A. *Employment Agreements.* Each member of an executive committee was offered an employment agreement with TMI. All of the employment agreements were executed by TMI. TMSI was not a party. The Board of Directors of TMI approved each employment agreement; the directors of TMSI did not even consider them.

Each employment agreement specifically defined TMI as the "Employer." Each agreement also contemplated that, at TMI's option, individuals would work for one or more TMI subsidiaries. The employment agreement provides that

> During the Employment Period, Employee shall serve as an Executive Vice President of Employer's subsidiary, Thomson McKinnon Securities, Inc. ("TMSI"), or in such other capacity and with such other duties as the Board of Directors of Employer ... may from time to time determine.... Such other duties may include the performance of services for any of Employer's subsidiaries and, without further remuneration (except as otherwise agreed), may also include service as an officer of one or more of Employer's subsidiaries....

Each of the employment agreements further provided that if TMI elected to have an officer perform duties for a subsidiary, TMI could, "at its option, cause such subsidiary to pay all or a portion of Employ-

ee's compensation hereunder." *E.g.*, Amorose Employment Agreement, at ¶ 1(b).

As the contracts expressly permitted, TMI caused its subsidiary, TMSI, to pay the salaries of the claimants during the periods of their employment. However, TMI never took any action expressly to assign any of its rights or obligations under the employment agreements to TMSI. Nor did TMSI ever take any action expressly to assume them. As the employment agreements expired, each of the claimants executed agreements extending their terms. All of these extension agreements were executed by TMI only.

The employment agreements each provided that in the event of termination the officers would be entitled, as liquidated damages, to their salaries and benefits for the remainder of the terms covered by the contracts. Four of the claimants, Clement J. Amorose ("Amorose"), Barnes, Richard F. Lynch ("Lynch") and William Gregory Robertson ("Robertson") contend that both TMI and TMSI should be held liable for such liquidated damages.

B. *Deferred Compensation Agreements.* Each member of an executive committee entered into a Deferred Compensation Agreement with TMI providing for the payment of $1 million, in monthly installments over a ten year period, after the employee reached the age of 65. Only TMI was a party. Each agreement, in its opening recitals, noted that TMI recognized that the efforts of the employee "on behalf of TMI and its affiliates" had contributed to the success and growth of TMI, and would continue to do so. Each agreement provided that "TMI" would make the required payments when the employee reached age 65 as follows:

> 11. *Status of the Employee's Rights.* The rights granted to the Employee or any designee or beneficiary under this Agreement shall be solely those of an *unsecured creditor of TMI.*

Deferred Compensation Agreement, at ¶ 11 (emphasis added).

Each agreement further provided that it could be amended only by an additional written agreement signed by all the par-

ties. There were no such written amendments. Each Deferred Compensation Agreement was approved by the TMI Board of Directors; they were never even considered by the TMSI Board of Directors.

When the chief accounting officer of TMSI entered the deferred compensation obligations on the consolidated general ledgers of TMI and TMSI he originally coded the obligations as obligations of TMSI. This was reversed in 1989. The chief accounting officer has testified that the entries were incorrect, that he had no authority to assume the obligations on behalf of TMSI and that TMSI did not assume the obligations. Each of the claimants has admitted that he did not know how the liabilities were recorded on the books of TMI and TMSI. Each claimant now contends, however, that both TMI and TMSI should be held liable for the deferred compensation obligations.

C. *Supplemental ESOP.* TMI had an Employee Stock Ownership Plan (the "ESOP") for the benefit of employees of TMI and its affiliates. TMI established a plan entitled the "Thomson McKinnon Inc. Supplemental Employee Stock Ownership Plan" (the "Supplemental ESOP"). Under the Supplemental ESOP, beneficiaries received awards of "phantom stock"—in other words, fictitious shares of TMI Class B Preferred Stock. The shares of phantom stock were assigned values equal to the book values that a real amount of such shares would have had on the pertinent Anniversary Date. That value was then fixed, and did not increase or decrease over time.

Vesting schedules were set forth in Article 7.04 of the Supplemental ESOP. When a participant reached age 65, he or she was entitled to receive any vested awards. If the participant died before reaching age 65, the participant's beneficiary was entitled to any vested sums.

Article 2.08 of the Supplemental ESOP defined the term "Company" as follows:

> 2.08 *Company*—the term "Company" shall mean Thomson McKinnon Inc., a Delaware corporation, and unless the context otherwise indicates, Thomson

McKinnon Securities, Inc., a Delaware corporation, and any affiliate of either such corporation which adopts the Plan with the consent of Thomson McKinnon Inc.

Article 4.01 provides that "the Company" could make awards under the Supplemental ESOP to participants in such amounts as may be determined by the Board of Directors. The "Board of Directors" was defined as the directors of TMI. The only awards ever made were made by TMI.

The Supplemental ESOP was approved by the TMI Board of Directors. It was never considered by the TMSI Board of Directors. Each award of Supplemental ESOP benefits was made by the TMI Board of Directors. Each award constituted phantom shares of TMI. In addition, each notification of Supplemental ESOP benefits was made by TMI to the recipient thereof. Each such notification specifically defined TMI as the "Company" making the award. Four claimants, Amorose, Barnes, Lynch, and Robertson seek payment of Supplemental ESOP balances from both TMI and TMSI.

D. *Indemnification Agreements.* Each of the claimants was a party to an indemnification agreement. Unlike the other agreements, these were executed on behalf of both TMI and TMSI. Five of the claimants Amorose, Barnes, Conley, Lynch and Robertson asserted contingent claims for indemnification under these agreements. However, none of the claimants has been sued or has incurred any expense or liability for any matter governed by any of the indemnification agreements. At the hearing, the claimants withdrew their indemnity claims.

E. *Miscellaneous Benefits.* Three of the claimants, Amorose, Barnes and Lynch, claimed compensation for severance pay and vacation pay.

### Lynch

4. Lynch worked in the securities business of TMSI for almost thirty years. In November 1983, Lynch was called into a meeting of the Executive Committee of TMSI (the "TMSI Executive Committee"), by Howard Whitman ("Whitman"), Senior Executive Vice President of TMSI and Lynch's supervisor at TMSI, where he was informed that he had been promoted to Executive Vice President of TMSI and Director of the firm's Capital Markets Division, and had been appointed to membership on the TMSI Executive Committee. The TMSI Executive Committee operated the securities business of the Company, under the direction of the TMI Executive Committee, the Company's policy and decision-making group.

5. It was the Company's practice to award key TMSI employees certain contract benefits upon their appointment to the TMSI Executive Committee. Consistent with that practice, Whitman informed Lynch of the additional compensation and benefits Lynch would receive in connection with his promotion to the TMSI Executive Committee in 1983. The key elements of the package were: 1) an employment agreement, which provided, *inter alia,* for payment of liquidated damages upon termination without cause (Lynch's "Employment Agreement"); 2) a deferred compensation agreement, which provided for ten annual payments to him of $100,000, commencing at age sixty-five or, if he died earlier, to his beneficiary or his estate (the "Deferred Compensation Agreement"); and 3) awards pursuant to the Supplemental ESOP. The written contracts documenting those entitlements, which designated TMI, as the "Employee", were subsequently presented to Lynch for signature by Newton B. Schott, Jr., Esq. ("Schott"), who was then General Counsel of TMSI. After the contracts were signed by TMI and Lynch, Lynch remained an employee of TMSI until he was terminated by TMSI, without cause, in breach of his Employment Agreement on September 30, 1989. All performance of Lynch's TMSI Compensation Contracts was by TMSI.

### Amorose

6. Amorose was originally hired by TMSI in 1970, as Branch Manager of the Clearwater, Florida office. In 1973, Amorose was promoted to Vice President and

Branch Manager of the Indianapolis, Indiana branch. In 1975, Amorose became Senior Vice President, Western Region Manager, San Francisco, California. Jack Phil ("Phil"), Executive Vice President Branch Administration, conducted the negotiations. In February, 1978, Phil, John Maloney ("Maloney"), Chairman of the Company, and J. Ronald Morgan ("Morgan"), President of the Company, asked Amorose to move to New York City. They promoted Amorose to National Sales Manager, at which time he was appointed a member of the Executive Committee of the Company, then called Thomson & McKinnon Auchincloss Kohlmeyer, Inc. Approximately six months later, Maloney informed Amorose that his new title was Executive Vice President. In 1980, the Company took the name TMSI. In approximately 1982, Philip M. Fahey ("Fahey") informed Amorose that his title was now Executive Vice President, Director of Sales and Marketing, TMSI. Amorose was informed as to the benefit components of his compensation package at a TMSI Executive Committee meeting. The fringe benefits contracts were subsequently delivered to Amorose for signature by General Counsel Schott. Amorose then signed and returned the contracts and later received a copy of the documents executed by TMI for his files.

7. Amorose's original Employment Agreement, dated January 4, 1982, provided for an employment period through December 31, 1986. One page agreements extending the employment period for a year at a time (the "extension agreements") were executed annually in April. The last extension agreement would have expired on December 31, 1989. The extension agreements did not provide for any increase in Amorose's salary, although Fahey informed him of his annual salary increases at the time of his annual year end review, which increases took effect the following January. In May of 1987, Amorose resigned from the TMSI Executive Committee and returned to California as Regional Vice President, Western Region. All performance of Amorose's contracts was by TMSI. On or about July 31, 1989, Amorose received a notice of termination from TMSI.

## Barnes

8. Barnes was first employed by the former Thomson & McKinnon securities partnership in 1954, as an account executive (registered representative). In 1966, Barnes became a Regional Vice President, as well as branch manager, and from that time on he reported directly to the president of the securities company. Between 1966 and 1968 Barnes reported to Maloney. In approximately 1968, the company incorporated under the name, "Thomson & McKinnon, Inc." Between 1968 and 1980, the securities firm changed names several times, although it always included the names "Thomson" and "McKinnon." Sometime in 1980, the Company took the name TMSI. Between 1968 and 1970, Barnes was Regional Vice–President for the Southeastern Region and reported to William E. Ferguson, who was then president of the securities company. In 1970, Barnes became Director of Sales. In 1979, he became Director of Marketing and in 1982, he became Director of Training, Senior Executive Vice President, TMSI.

9. In 1980, Barnes received his first employment contract, for a term of five years, which was signed by Ferguson. The "Employer" was designated as TMI. There was no discussion of its terms. The contract was sent to Barnes by Schott, with Schott's TMSI business card attached, after Schott's secretary had called to confirm that Barnes was available to receive it. After it was fully executed, Barnes received a copy. In April, 1982, Barnes received an employment agreement executed by Morgan, on behalf of TMI. The same procedure was followed. Thereafter, one page agreements extending the employment period for a year at a time (the "extension agreements") were executed annually in April. The extension agreements were sent to him for signature without any explanation of the terms and without a copy of the original Employment Agreement attached. The last extension agreement expired December 11, 1989. Barnes was a member of the TMSI Executive Com-

mittee from approximately 1972 through 1986, when he was "asked" to resign from it. Whitman assured Barnes at that time, that his compensation package, including his rights under the employment and deferred compensation agreements, would be unaffected by the change. On or about July 31, 1989, Barnes received a notice of termination from TMSI.

### Conley

10. At the time that Conley was originally hired by TMSI in 1982, Ida Brancato ("Brancato"), Senior Vice President of TMSI, negotiated with him on behalf of TMSI regarding the terms of his employment. Conley received a letter agreement on TMSI stationery, signed by Brancato, dated October 13, 1982, outlining the terms of his employment by TMSI. Once Conley was hired, there were no further negotiations regarding the terms of his employment. He was merely informed of changes in the terms of his employment. Conley reported directly to Brancato until approximately December, 1983, when he began reporting directly to Fahey. On or about December 7, 1984, Conley was promoted to Executive Vice President of TMSI and became a member of the TMSI Executive Committee. At that time, he was informed of his new salary by Fahey, the President of TMSI. Fahey also told Conley that Michael S. Shapiro ("Shapiro"), the Chief Financial Officer of TMSI, would describe the total compensation package, including benefits, that Conley would receive as a TMSI Executive Vice President. The compensation, which included deferred compensation, was subsequently described to him by Shapiro. The fringe benefits contracts were delivered to Conley through General Counsel Schott's office. Conley then returned the documents which he signed and later received a copy of the executed documents for his files. He did not receive a new employment agreement each time he was given his annual raise. The last employment agreement contract received by Conley was dated October 1, 1988, and it was signed by Morgan, on behalf of TMI as "Employer." The contract would have expired on December 31, 1991.

11. As head of the TMSI Information Services Division, Conley was in charge of all data processing and related departments. Beginning some time in 1986, Conley initiated a major overhaul of all functions under his control to reduce costs and improve profitability of TMSI, which culminated in Conley's development of a plan to have all of the data processing activities of TMSI done by an outside consultant (known as "outsourcing") at substantial savings. Conley pushed the outsourcing program to the TMSI Executive Committee, negotiated with consultants, and in December 1988 an outsourcing and capital infusion contract was signed with Automatic Data Processing ("ADP"). As a result of the outsourcing deal, the TMSI Information Services Division was eliminated and Conley's services were no longer needed by TMSI.

12. Although Morgan and Fahey offered to continue Conley's employment pursuant to the terms of his employment agreement, Conley declined to stay without performing meaningful services for the company. A termination agreement was reached and set forth in a memorandum on stationery with the letterhead "Thomson McKinnon Memo," from Fahey to Conley, dated March 14, 1989 ("Termination Agreement"). The Termination Agreement preserved Conley's rights under the Deferred Compensation Agreement. Although the Termination Agreement does not specify which entity was obligated thereunder, TMSI paid all of the amounts owed to Conley pursuant to the Termination Agreement, as it had under the TMSI Compensation Contracts, except for the Deferred Compensation payments, which were not due to be paid prior to the Debtors' filing dates. Conley now seeks payment of the present value of the deferred compensation pursuant to the terms of the Deferred Compensation Agreement and the Termination Agreement.

### Kimball

13. Robert M. Kimball ("Kimball") was an officer of TMSI in 1973 when it acquired the assets of a smaller brokerage firm he

had worked for named Halle, Stiglietz, Inc. During the period 1973 through November 1983, Kimball served in various capacities for TMSI as a branch manager and then regional manager of certain of its domestic retail branches.

14. On or about November 16, 1983, Kimball was promoted to the position of Executive Vice President of TMSI and was put in charge of TMSI's domestic retail branches. At that time, Kimball was asked to sign a written employment agreement with TMI for the period ending December 31, 1988. The employment agreement provided, *inter alia,* that Kimball would serve as an Executive Vice President of TMSI. At no time was Kimball an officer or director of TMI. On November 18, 1983, Kimball was also elected to serve on the Executive Committee of TMSI.

15. Because of his service on the TMSI Executive Committee, Kimball's compensation included the right to receive deferred compensation of $100,000 per year for 10 years beginning when he retired at the age of 65. The deferred compensation arrangement was explained to Kimball by Philip Fahey, the President of TMSI. Mr. Fahey did not distinguish between TMI and TMSI in his explanation and did not tell Kimball then or at any time that the obligation to pay him deferred compensation would rest only with TMI and not with TMSI.

16. On November 16, 1983, Kimball signed a written deferred compensation agreement with TMI. Kimball did not seek independent legal advice when he did so, but simply signed the agreement as requested by TMSI's senior management.

17. During Kimball's employment with TMSI, all of his paychecks came from TMSI and all of his other benefits were paid for by TMSI. At no time did TMI pay Kimball any compensation.

18. · In early 1987, it was agreed by Kimball and Fahey that the former would take early retirement effective January 1, 1988, at the age of 64 with full benefits.

19. In May 1987, Kimball met with George McAden, the person at TMSI responsible for retirement benefits, to discuss the benefits he would be entitled to

receive upon retiring. Kimball and McAden specifically discussed the question of whether TMSI would be liable for deferred compensation. Subsequently, McAden provided Kimball with a memorandum dated May 11, 1987 on letterhead entitled "Thomson McKinnon Human Resources." The memorandum stated in relevant part:

> As a retiring member of the Executive Committee, you will receive an annual payment of $100,000.00 for a *guaranteed period* of ten years, commencing October 1, 1988. This payment, which will be on a monthly basis, will continue to Mr.[s] Kimball if you do not survive the ten years. *This is a non-qualified Plan and thus is an unfunded obligation of Thomson McKinnon Securities.*

Memorandum (emphasis added).

20. To fund its obligation to pay Kimball deferred compensation, TMSI bought a series of zero coupon bonds in 1987. The bonds were paid for and owned by TMSI. In its accounting records and tax returns through mid–1989, TMSI treated the zero coupon bonds as being owned by it.

21. Following his retirement on January 1, 1988, Kimball received deferred compensation payments from TMSI in the amount of $8,333.33 per month until June 1989. All checks came from TMSI.

22. TMSI issued 1099 Tax Forms to Kimball in 1988 and 1989 indicating that it was the payor of the deferred compensation. These forms were also sent by TMSI to the Internal Revenue Service. TMSI's tax returns for 1988 and 1989 recorded the deferred compensation payments made to Kimball as its expense.

23. Kimball filed a timely proof of claim against both TMI and TMSI for deferred compensation. His claim against TMI was allowed and, without prejudice to his claim against TMSI, it was stipulated that the amount of deferred compensation owing to Kimball as of the date of the bankruptcy filing was $664,703.21. Pursuant to TMI's reorganization plan, Kimball was treated as a Class III creditor and has received an initial payment from TMI of $56,588.18, or 8.5133% of the total.

24. TMSI paid all the salaries of TMI's officers. TMSI bought zero coupon bonds and life insurance policies to fund deferred compensation plans of TMSI officers including Kimball. TMSI never received reimbursement from TMI of any of these amounts. TMI never recorded on its books a liability to reimburse TMSI the cost of these bonds and policies. TMI never recorded on its books prior to mid–1989 (some 18 months after Kimball had retired) any obligation to pay deferred compensation to any TMSI officers.

25. TMI's senior officers were paid salaries and expenses by TMSI. TMI never recorded any obligation to reimburse TMSI the amounts so paid.

26. One of the reasons that in mid–1989, the deferred compensation obligation was recharacterized as an obligation of TMI was to reduce the stated liabilities of TMSI during acquisition negotiations with Prudential–Bache Securities. Kimball was retired at that time and was never informed of, nor did he agree that the obligations to him for his compensation were owed by TMI only.

### Vogel

27. David J. Vogel ("Vogel") has filed a proof of claim for deferred compensation only. In 1979 he was employed by the Commodities and Futures Group at TMSI. In 1983, he was in charge of the Capital Markets area for TMSI. In 1985, Vogel was appointed to the TMSI executive committee.

28. In December, 1985, Vogel was appointed to the Executive Committee of TMSI and was informed that among the benefits he would receive was a deferred compensation package. He was given TMI's standard Deferred Compensation Agreement which designated TMI as the "Employer" and Vogel as the "Employee." The document dated December 11, 1985, was executed by TMI and Vogel and an executed copy was given to Vogel.

29. On August 3, 1988, Vogel's employment was terminated. However, in a letter dated August 11, 1988, signed by J. Ronald Morgan, Chairman of the Board of TMSI, TMSI stated that it would continue to pay Vogel's compensation as provided in his contract until December 31, 1990. Additionally, Morgan stated that Vogel's deferred compensation contract will remain in force in accordance with its terms.

### Robertson

30. William Gregory Robertson ("Robertson") had been a securities executive with Goldman, Sachs & Co. in late 1984 when he was recruited to work for TMSI. In a letter on TMSI stationery, dated December 17, 1984, David B. Hiley, as Executive Vice President of TMSI welcomed Robertson to the team, stating that "this move will be outstanding for Thomson McKinnon as well as for you personally...." The letter spelled out the details of their understanding in relevant part as follows:

This letter will spell out the details of our understanding. You will be paid a base salary of $150,000 and a bonus of $450,-000. The bonus will be paid to you at your discretion. The $600,000 minimum compensation will be guaranteed for a period of three years. Depending on Firm profitability and your performance, your earnings could exceed $600,000.

Further, you will be able to lease an automobile, and lunch club membership will also be paid for by the Firm. Life insurance provided for you will be $750,-000 and you will be covered for up to $10,000 in excess of your medical insurance.

You will also be granted $200,000 worth of stock which will vest in two years. Over and above the regular retirement package, we are providing an additional $100,000 per year for ten years, starting at age 65. Should you die, your estate would be the beneficiary.

Greg, your title will be Executive Vice President and Director, and you will, of course, be a member of the Executive Committee of Thomson McKinnon Securities Inc. Again, we are delighted with your decision and look forward to seeing you soon. Also, let me wish you and your family a healthy and happy holiday.

Warm personal regards,

s/ David B. Hiley
David B. Hiley
Executive Vice President.

Trial Exhibit I.

By letter dated January 7, 1985, Robertson submitted his resignation to Goldman, Sachs & Co. and advised that he had accepted the position of Executive Vice President and Director of TMSI.

31. On January 14, 1985, Robertson executed the standard Employment Agreement with TMI stating that he would "serve as Executive Vice President of Employer's subsidiary, Thomson McKinnon Securities Inc. (TMSI)...." Paragraph 12 of the January 14, 1985 agreement provides as follows:

12. *Prior Agreements*

This Agreement contains the entire agreement between Employee and Employer and supersedes all prior negotiations and written or oral agreements with respect to the full time employment of Employee by Employer. No changes, alterations or modifications hereof may be made, except by a writing signed by each of the parties hereto.

The formal agreement was executed by Morgan and Schott for TMI and by Robertson as the "Employee."

32. On January 17, 1985, Robertson also executed a Deferred Compensation Agreement with TMI which contained the following standard clause:

11. *Status of the Employee's Rights.* The rights granted to the Employee or any designee or beneficiary under this Agreement shall be *solely those of an unsecured creditor of TMI.*

Trial Exhibit 10 (emphasis added).

33. Additionally, on January 16, 1985, Robertson received from TMI a Supplemental ESOP Notice to participants relating to the so-called phantom shares of TMI stock. Trial Exhibit 17.

34. On July 31, 1989, Robertson received from TMSI the standard Plant Closing Notice sent to all TMSI employees. Thereafter, Robertson agreed to stay on with "Thomson" pending the contemplated sale of assets to Prudential–Bache Securities, Inc. This confirmation on TMSI let-

terhead and signed by Philip Fahey, reads as follows:

September 7, 1989

Mr. W. Gregory Robertson

Dear Mr. Robertson:

For our mutual records, this will confirm an agreement reached between you and Thomson McKinnon Securities Inc. ("Thomson"). Under the terms of the agreement, you have agreed to defer other employment opportunities until the consummation of the pending sale of assets by Thomson to Prudential–Bache Securities Inc. during which time you will remain an employee of Thomson and devote your attention to an expeditious and economical consummation of such sale.

In consideration for your commitment during this time period, Thomson has entered into a Trust Agreement, dated as of September 6, 1989, with Thomson McKinnon Inc. and Thomson McKinnon Bank & Trust Co., as trustee, under which you are a Beneficiary (as defined therein).

Please confirm your agreement by acknowledging below.

Very truly yours,
s/ Philip M. Fahey

Agreed:

s/ W. Gregory Robertson

Dated:

Sept. 7, 1989

35. The liquidating plan of reorganization for TMI was confirmed by this court pursuant to an order dated August 14, 1992. Under the plan, TMI's unsecured creditors will receive a distribution of approximately ten percent. The liquidating plan of reorganization for TMSI has not yet been confirmed.

## DISCUSSION

TMI, the parent corporation, does not deny and, indeed admits, that it is obligated to the claimants for contractual compensation, but subject to the one year limitation for termination of employment contracts, as set forth in 11 U.S.C. § 502(b)(7)(A) and subject to a discount as to deferred com-

pensation for those claimants who have not yet reached the required age of 65 years. The subsidiary corporation, TMSI, denies any liability to the claimants on the ground that it was not a party to any contracts with the claimants for such compensation and that they performed duties for TMSI, were executive officers and directors of TMSI, and were compensated by TMSI in accordance with the express terms of their written contracts with the parent corporation, TMI. All of the deferred compensation agreements between TMI and the claimants specifically provided that the rights granted to the claimants "shall be solely those of an unsecured creditor of TMI."

Claimant Robertson relies on a letter from TMSI setting forth the details of his proposed position as Director and Executive Vice President of TMSI, which were later embodied in a formal standard contract executed by the parent corporation, TMI, and himself.

The claimants have advanced various legal theories why the plain language of the written contracts between the parent, TMI, should be disregarded for the purpose of establishing that the subsidiary, TMSI, should be responsible for the contractual rights claimed by them.

### Assumption of Obligations

Claimants argue that a party's contractual obligations may be assumed by one who is not a party to the existing contract. Under New York law, which applies because the contracts were executed in New York and were to be performed in New York, a third party's assumption of a bilateral contract must be express and may not be implied by conduct. *Lachmar v. Trunkline LNG Co.*, 753 F.2d 8, 9–10 (2d Cir.1985); *Sillman v. Twentieth Century Fox Film Corp.*, 3 N.Y.2d 395, 165 N.Y.S.2d 498, 503, 144 N.E.2d 387, 392 (1957); *Kagan v. K–Tel Entertainment, Inc.*, 172 A.D.2d 375, 568 N.Y.S.2d 756, 758 (1st Dept.1991). There was no proof that the Board of Directors of TMSI ever approved an assumption of TMI's obligations to compensate executive officers and directors of TMSI. The fact that the claim-

ants performed services for TMSI and not for TMI, and that they were compensated by TMSI does not establish that TMSI assumed the obligations under the claimants' contracts with TMI, the parent corporation. Their services for TMSI and the payment of their compensation by TMSI were entirely consistent with the terms and conditions in their contracts with TMI which provided that they could work for any of TMI's subsidiaries and be paid their salaries by such subsidiaries.

Moreover, because TMSI received the benefits of the defendants' employment contracts with TMI, it does not follow that TMSI should therefore be obligated to the defendants under their employment contracts with TMI. The defendants had no written contract with TMSI and, therefore, they must look to TMI for their compensation. *Kagen*, 568 N.Y.S.2d at 757. In *Citrin v. Columbia Broadcasting System, Inc.*, 29 A.D.2d 740, 286 N.Y.S.2d 706 (1st Dept.1968), an individual sought recovery from a corporate defendant for services rendered to that corporation pursuant to arrangements made by the individual solely with another corporate defendant. The court held:

> While it is alleged that CBS benefited from such services, it is conceded that it was a stranger to the entire transaction. Such services, whether premised upon the theory of contract implied in law or contract implied in fact, cannot cast CBS in liability.

*Id.*, 286 N.Y.S.2d at 707 (citations omitted). While TMSI was not a stranger to the instant transactions, it had no contractual arrangements with the claimants, and it obtained their services pursuant to the express agreements between the claimants and TMI. Even more importantly, TMSI is not even an assignee of the contracts between the claimants and TMI because there was no assignment of such contracts by TMI.

In *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 53 (2d Cir. 1984), a successor corporation was liable for the obligations of an acquired company. This case illustrates the theory of succes-

sor liability and not implied assumption as suggested by the claimants. Nor is this a case where one corporation transferred employees to another corporation in order to avoid salary obligations owed to them. *See, e.g., Hudson Oil Field Material Co., Inc. v. R.M. Stuard*, 406 F.2d 1052 (5th Cir.1969). The fact that TMSI's financial officer, Michael Shapiro, carried the contractual obligations, deferred compensation and Supplemental ESOP obligations on the books of TMSI until June of 1989, when he adjusted the records and booked them to TMI, does not establish an express assumption of the obligations. Moreover, the claimants may not claim that this conduct constituted an estoppel, especially when they were not aware of these bookkeeping arrangements, nor was there any proof that they relied on these entries. Similarly, the fact that TMSI made some deferred compensation payments to claimant Kimball until June of 1989, when the bookkeeping adjustments were made and the obligations were booked to TMI, does not thereby establish that TMSI expressly assumed TMI's contractual obligations for deferred compensation. *See Kent v. Dale Factors Corp.*, 67 A.D.2d 848, 413 N.Y.S.2d 13, 14 (1st Dept.1979) (loan payments made by three companies for four years on behalf of a fourth company to a senior officer shared by all four did not constitute an assumption of the fourth company's debt.)

### *Piercing the Corporate Veil*

■ The corporate veil may be pierced either when there is fraud or when the corporation has been used as an alter ego. *Itel Containers Int'l Corp. v. Atlanttrafik, Exp. Serv. Ltd.*, 909 F.2d 698, 703 (2d Cir.1990). There has been no proof of either fraud or breach of a duty owed to the claimants in the instant case. The claimants simply seek to recover from TMSI obligations which TMI admits are owed by it pursuant to written contracts with the claimants. The claimants maintain that TMI has manipulated the corporate firm so as to insulate TMSI from the legitimate claims of its employees. In *Wm. Passalacqua Builders, Inc. v. Resnick Developers*

*South, Inc.*, 933 F.2d 131, 139 (2d Cir.1991), the Second Circuit delineated ten factors for imposing liability on the alter ego theory upon a showing of such control by the dominating corporation that it is in fact the alter ego of the subservient corporation. These factors are:

(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Wm. Passalacqua Builders*, 933 F.2d at 139 (citations omitted).

■ In the instant case, the claimants reason that TMSI was controlled by TMI through interlocking officers and directors. TMI had no operating departments and utilized TMSI's staff to perform accounting, marketing and other functions for TMI and its subsidiaries. TMI and TMSI operated out of combined offices with signs and stationery that said "Thomson McKinnon." Thus, the claimants argue that where a parent company's officers and employees control the actions of their subsidiaries with respect to the transaction in controversy, unitary liability can be imposed on both corporations. *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 30 N.Y.2d 34, 330 N.Y.S.2d 329, 331, 281 N.E.2d 142, 144, *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128

(1972); *Stone v. Eacho* (*In re Tip Top Tailors, Inc.*), 127 F.2d 284 (4th Cir.1941), cert. denied, 317 U.S. 635, 63 S.Ct. 54, 87 L.Ed. 512 (1942). The flaw in this argument is that the corporate veil is pierced so as to also hold the dominating or controlling corporation liable for the obligations of the subservient corporation. In the instant case, TMI is the parent corporation and admittedly controls its subsidiary TMSI. TMI also concedes that it is contractually obligated to the claimants. However, the claimants seek a reverse piercing of the corporate veil to hold the subsidiary, TMSI, liable for the admitted liabilities of its parent corporation, TMI.

Obviously, the subsidiary, TMSI, cannot be held to have dominated its parent corporation, TMI. The concept of reverse corporate veil piercing to hold a subsidiary liable for obligations of its parent is a rare occurrence. An example of this application may be found in *In re Mid–West Metal Products, Inc.*, 13 B.R. 562 (Bankr.D.Kan.1981), where the court held a subsidiary liable for compensating an employee whose contract was with the parent corporation. It was unclear which corporation was the actual party to the contract because the subsidiary's officers signed the contract in their capacities as officers of the subsidiary. The court concluded that the subsidiary was actually the real party to the contract.

In the instant case, there is no dispute that the claimants' contracts with TMI were signed by officers of TMI in their capacity as such, and not by officers of the subsidiary, TMSI. There is an additional reason why reverse corporate veil piercing is inappropriate. The claimants are executive officers and directors of the subsidiary, TMSI. They are charged with the knowledge that the entity of which they are directors and executive officers is separate and distinct from the corporate parent. As directors and officers of TMSI it was their duty to maintain the separate corporate integrity of TMSI. It would be inappropriate to pierce their corporation's veil and to impose additional contractual obligations on TMSI for the claimants' pecuniary benefit, to the detriment of third party creditors. TMSI's insider executive officers and directors should not be allowed to profit at the expense of TMSI's creditors by disregarding the corporate entity they are charged to maintain. *See Schenley Distillers Corporation v. United States*, 326 U.S. 432, 437, 66 S.Ct. 247, 249, 90 L.Ed. 181 (1946); *Coast Mfg. Co., Inc. v. Keylon*, 600 F.Supp. 696, 698 (S.D.N.Y. 1985).

*Guaranty*

Claimant Kimball contends that the memorandum dated May 11, 1987, signed by George McAden, a benefits manager for TMSI, written on the letterhead of Thomson McKinnon Human Resources, constituted an assumption of obligations or a guaranty by TMSI of Kimball's deferred compensation. Kimball notes that the May 11, 1987 memorandum was given to Kimball; that TMSI bought zero coupon bonds to cover the obligation to Kimball; that TMSI paid Kimball for eighteen months after he retired; that TMSI filed tax returns reflecting a liability to Kimball; and TMSI entered the obligation on its books. From these facts, Kimball concludes that these actions constituted an irrevocable affirmance by TMSI of its assumption of the obligation to pay Kimball his deferred compensation. However, paragraph 1 of the Deferred Compensation Agreement between TMI and Kimball specifically provides that "TMI agrees to pay" the deferred compensation. As an officer and director of TMSI, Kimball knew that neither TMSI's executive committee nor its board of directors ever agreed to assume TMI's obligations to pay deferred compensation. Specifically, the written agreement provided that Kimball's rights would be "solely those of an unsecured creditor of TMI." Manifestly, TMSI is not estopped to deny its liability because its erroneous post-retirement payments to Kimball did not result in any detrimental reliance on Kimball's part. On the contrary, the wrong corporate entity paid benefits to Kimball for eighteen months, which fact did not cause any harm to him. This procedure was not inconsistent with the manner in which Kimball was compensated before his

retirement. His salary and benefits were paid to him by TMSI even though his employment contract was with TMI, the parent corporation. The TMI Employment Agreement specifically provided that TMI, as his employer, could cause its subsidiary to pay his compensation. Thus, the conduct of TMSI was compatible with Kimball's original Employment Agreement with TMI, and therefore, such compatible conduct cannot constitute a modification or an assumption of TMI's obligations under its Deferred Compensation Agreement with Kimball. *See General Overseas Films, Ltd. v. Robin International, Inc.*, 542 F.Supp. 684, 690 (S.D.N.Y.1982), *aff'd*, 718 F.2d 1085 (2d Cir.1983). Additionally, for equitable estoppel to apply, the conduct relied upon must *not* otherwise be compatible with the governing written agreement. *Towers Charter & Marine Corp. v. Cadillac Insurance Co.*, 894 F.2d 516, 522 (2d Cir.1990).

■ In arguing guaranty, Kimball refers to the May 11, 1987 memorandum from George McAden, which reads in relevant part as follows: "This is a nonqualified plan and thus is an unfunded obligation of Thomson McKinnon Securities." There was no evidence that McAden had any authority, real or apparent, to cause TMSI to guaranty TMI's contractual obligation for deferred compensation. McAden may have made this statement in reliance on the fact that the TSMI books at that time reflected the compensation packages for the TMSI executives as obligations of TMSI. Shapiro, the financial officer, testified that this was a mistake and the books were adjusted in June 1989 to reflect the compensation obligations as liabilities of TMI. In any event, there was no evidence that McAden's statement that Kimball's deferred compensation was an unfunded obligation of TMSI was ever adopted by TMSI's Board of Directors.

In determining whether McAden had apparent authority to cause TMSI to guaranty Kimball's deferred compensation, the court must ascertain if Kimball reasonably believed that McAden was authorized to obligate TMSI to assume TMI's deferred compensation obligation to Kimball. A guaranty by TMSI of TMI's obligations would be an extraordinary transaction not in the ordinary course of TMSI's business and would require approval by TMSI's Board of Directors. *See General Overseas Films*, 542 F.Supp. at 691. As a member of TMSI's board of directors, Kimball was aware that McAden was not authorized to issue such a guaranty. Significantly, Kimball failed to prove that McAden had apparent authority to cause TMSI to guaranty to TMI's obligation to Kimball for deferred compensation. Nonetheless, because McAden's memorandum did not constitute a guaranty, it follows that the issues of adoption or ratification by TMSI are irrelevant.

### Robertson's Offer on TMSI Letterhead

■ The December 17, 1984 letter from Hiley to Robertson outlining Robertson's compensation package was sufficient to constitute a valid offer, which could form the basis of a contract with TMSI. However, on January 14, 1985, Robertson signed the standard TMI Employment Agreement which specifically stated that it superseded all prior negotiations or agreements between the parties with respect to Robertson's employment. Upon expiration, Robertson executed an extension agreement extending the terms of his Employment Agreement. The extension agreement was executed by TMI and not TMSI. The Separate Deferred Compensation Agreement which Robertson also executed on January 17, 1985 was with TMI only. Similarly, the Supplemental ESOP award, dated January 16, 1985, which was transmitted to Robertson was signed by Morgan for TMI. In light of the superseding contracts which Robertson executed with TMI after he received the December 17, 1984 offering letter, it follows that Robertson could only expect to receive his deferred compensation and Supplemental ESOP benefits from TMI. Although Robertson received his salary from TMSI, this was pursuant to the terms of the contract he entered into with TMI, dated January 17, 1983, as thereafter extended by TMI. Robertson had no independent employment agreement with TMSI.

*Severance Pay*

■ Amorose and Lynch have submitted claims for severance pay. There was no proof that TMI had any plan for severance pay. TMSI did have a severance plan. However, the TMSI severance plan, as amended, provided that salaried employees would not be entitled to severance pay if they accepted an offer of employment from Prudential–Bache Securities. TMSI sold its retail brokerage branches to Prudential–Bache Securities and both Amorose and Lynch continued to perform the same services for Prudential–Bache at the same salaries as previously paid by TMSI. The general rule is that employees kept on by a successor employer following the purchase of the business are not entitled to severance pay because they have not suffered a job termination and a severance payment would give them a windfall because they were never out of work. *Bradwell v. GAF Corp.*, 954 F.2d 798, 800–01 (2d Cir.1992); *Schwartz v. Newsweek, Inc.*, 827 F.2d 879, 882–83 (2d Cir.1987). Therefore, the severance pay claims of Amorose and Lynch must be denied.

*Deferred Compensation and Supplemental ESOP*

All of the claimants have filed claims for Deferred Compensation and Supplemental ESOP awards under their contracts with TMI. Although their claims were asserted against TMSI and TMI, they will be allowed against TMI, but limited to the amounts appropriately allowable. The Deferred Compensation contracts provide for the payment over a ten year period, after the employee reaches the age of 65. Thus, a lump sum amount payable in one distribution from TMI must be discounted for the ten year acceleration and further discounted for those claimants who have not yet reached the age of 65. TMI presented evidence as to the discounted values for the amounts owed to all of the claimants for Deferred Compensation and to Amorose, Barnes, Lynch and Robertson for Supplemental ESOP. These discounted figures have not been persuasively contraverted and will be allowed against TMI.

*Contractual Liquidated Damages*

The amounts claimed by Amorose, Barnes, Lynch and Robertson must be limited to the one year termination provision in 11 U.S.C. § 502(b)(7)(A) which reads as follows:

(7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds—

(A) the compensation provided by such contract, without acceleration, for one year following the earlier of—

(i) the date of the filing of the petition; or

(ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract.

11 U.S.C. § 502(b)(7)(A).

The amounts, as limited, have been stipulated and will be allowed as claims against TMI, subject to the setoff claims TMI has against the various claimants for loans advanced to them.

CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(A). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(B).

2. The claims asserted by the claimants against TMSI shall be expunged because the contractual obligations upon which the claims are based are obligations of TMI and not TMSI.

3. TMI is obligated to all of the claimants for Deferred Compensation, discounted for a ten year period and for those employees who had not reached the age of 65 as of March 28, 1990, when TMI filed its Chapter 11 petition. However, TMI may offset against these amounts the amounts owed by the claimants for loans advanced to them by TMI.

4. TMI is obligated to claimants Amorose, Barnes, Lynch and Robertson for Supplemental ESOP awards, discounted as of March 28, 1990, when TMI filed its

Chapter 11, for those claimants who had not then reached 65 years of age.

5. TMI is obligated to Amorose, Barnes, Lynch and Robertson for damages stemming from the termination of their employment contracts, limited to the one year provision set forth in 11 U.S.C. § 502(b)(7)(A).

6. The claims of Amorose and Lynch for severance pay are denied.

SETTLE ORDER in accordance with the foregoing.