**ARCHIE COMIC PUBLICATIONS, INC., Plaintiff,**

v.

**Daniel S. DECARLO, Defendant,**

**ABC, Inc., et al., Additional Defendants on Counterclaims.**

No. 00 CIV 5686.

United States District Court, S.D. New York.

April 27, 2001.

Leora Herrmann, Edmund J. Ferdinand, Grimes & Battersby, LLP, Mamaroneck, NY, for Plaintiff and Counterclaim Defendants.

Whitney North Seymour, Jr., Craig A. Landy, Landy & Seymour, New York City, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

This case opens the second round in the comic book fight between Daniel S. DeCarlo, a long time comic book artist, and Archie Comic Publications, Inc. ("ACP"), the comic publisher for which DeCarlo long drew a number of well known comic books. The first round closed with the dismissal of *DeCarlo v. Archie Comic Publications, Inc.,*[1] a case in which DeCarlo claimed ownership of the *She's Josie* strip long drawn by him and published by ACP. This one opens with DeCarlo's claim to ownership of the *Sabrina the Teenage Witch* series, which led ACP to bring this action for a declaratory judgment and DeCarlo to counterclaim in order to assert here with respect to *Sabrina* much the same position that he lost with respect to *Josie.*

ACP now moves to dismiss DeCarlo's counterclaims pursuant to Rule 12(b)(6) and for sanctions pursuant to Rule 11.

### Facts

As this is a motion to dismiss, the well pleaded factual allegations of the counterclaims and the inferences reasonably drawn therefrom are accepted as true.

DeCarlo claims that in or about 1962, working with a writer named George Gladir, he "created the physical appearance, mannerisms, personality and 'look' of a new comic book character named 'Sabrina the Teenage Witch' which subsequently first appeared publicly in a cartoon story published by ACP in an issue of *Archie's Madhouse.*"[2] DeCarlo created the original model sheet for Sabrina and personally did all of the original design and creative art work for her and various supporting characters.[3] In short, he contends that "[t]he entire visual 'look' of the Sabrina

---

1. 127 F.Supp.2d 497 (S.D.N.Y.2001) (appeal pending).

2. Answer to Supplemental Complaint and Counterclaims ("Ans.") ¶ 53.

3. *Id.*

comic books" was his creative product.[4]

The counterclaim is divided into three parts, each denominated a counterclaim and each dealing with a particular complex of facts. Each so-called counterclaim contains one to five parts designated as claims for relief, each of which seeks relief on a different legal theory with respect to the complex of facts asserted in the "counterclaim" to which it refers. It is helpful to follow this structure in discussing DeCarlo's contentions.

*First Counterclaim*

The first counterclaim relates to DeCarlo's claim of ownership of the *Sabrina the Teenage Witch* comic strip and characters.

According to DeCarlo, ACP began publishing the Sabrina comic books in 1971 and continued until 1983 during which period DeCarlo did all of the art work on a fixed "page rate" payment basis.[5] At subsequent dates, DeCarlo claims, ACP "wrongfully transferred control" over DeCarlo's alleged property in violation of Sections 106(5) and 201(c) of the Copyright Act[6] in order to exploit it in connection with a television sitcom series, animated cartoons, CD–ROM software games and other uses. This is said to give rise to five claims for relief:

The first claim for relief alleges that ACP and two of its principals "assumed a position of special trust and confidence with regard to" DeCarlo and his creations, "including a duty not to use such creations in any way other than in accordance with the terms of their agreements."[7] The al-

leged "secret transfer ... of control over" DeCarlo's interest in the *Sabrina* strip therefore allegedly constituted a breach of fiduciary duty and resulted in their holding the proceeds of those activities as constructive trustees on DeCarlo's behalf.[8]

The second through fifth claims for relief rely on substantially the same facts, but seek recovery on additional theories. The second contends that the use of the *Sabrina* characters in a television series is actionable unfair competition. The third asserts that the counterclaim defendants have misappropriated DeCarlo's efforts. The fourth charges conversion of DeCarlo's property by ABC, which broadcasts the television series. Finally, the fifth purports to assert a claim for unjust enrichment.

*Second Counterclaim*

DeCarlo changes gears in the second counterclaim, which is brought under Section 43(a) of the Lanham Act.[9] Here he contends that ACP, its principals, and various "John Does" have portrayed the television series and the animated cartoons falsely "as the creation and property of" ACP by broadcasting them with a credit line stating "Based on Characters Appearing in Archie Comics."[10]

*Third Counterclaim*

The third counterclaim parallels the first and adds also claims against Archie Comics Online, Inc. ("ACO"), a recently-dissolved entity which owned and operated the Archie Comics Online web site.[11] De-

---

4. *Id.* ¶ 54.

5. *Id.* ¶¶ 55–56.

6. 17 U.S.C. § 106(5), 201(c).

7. Ans. ¶ 62.

8. *Id.*

9. 15 U.S.C. § 1125(a).

10. Ans. ¶¶ 72, 75.

11. ACP asserts that DeCarlo served a summons and complaint on ACO, LLP, the successor in interest to ACO, Inc., and that ACO, LLP joins in the motion on behalf of ACO, Inc. *See* Pl. Mem. 1 at n. 1. DeCarlo has not reflected the change of parties in his Answer to Supplemental Complaint and Counter-

Carlo asserts that he owns "a property interest in the principal and supporting comic book characters in the comic book series *Sabrina the Teenage Witch, Josie and the Pussycats,* and *Cheryl Blossom*" in that they all allegedly were created by DeCarlo.[12] And he claims that ACP, ACO and their principals and affiliates violated DeCarlo's rights under the Copyright Act by unlawfully licensing, selling and otherwise using those characters.[13] This grievance finds expression in purported claims for breach of fiduciary duty, unfair competition, misappropriation, conversion and unjust enrichment.[14]

### The Motion to Dismiss

*Preemption*

The counterclaim defendants begin their attack on DeCarlo's counterclaim by attacking the second through fifth claims for relief in the first and third so-called counterclaims as having been preempted by the Copyright Act of 1976.[15]

■ As ACP argues, when "Congress amended the Copyright Act in 1976, it provided for the preemption of state law claims that are interrelated with copyright claims in certain ways."[16] Indeed, both sides here agree[17] that Section 301[18] preempts a state law claim when "(i) the state law claim seeks to vindicate 'legal or equitable rights that are equivalent' to one of the bundle of exclusive rights already

protected by copyright law under 17 U.S.C. § 106—styled the 'general scope requirement'; and (ii) the particular work to which the state law claim is being applied falls within the type of works protected by the Copyright Act under Sections 102 and 103—styled the 'subject matter requirement.'"[19] The point of difference between the parties is whether DeCarlo's unfair competition, unjust enrichment, misappropriation and conversion claims are covered by Section 301.

DeCarlo's position is simplicity itself. He argues that he "consistently has maintained [here and in the *Josie* case] that the state law rights which he seeks to protect are outside the scope of and not protected by the Copyright Act."[20] Indeed, he acknowledges that the issue (at the time his brief in this case was filed) was fully briefed and *sub judice* in the *Josie* case.[21]

In the *Josie* case, DeCarlo claimed ownership of the *Josie* characters on the basis of his alleged creation of them and asserted purported state law claims very much like those at issue here. This Court concluded that "it is authorship that forms [DeCarlo's] only alleged basis for rights in the ... characters." And it went on to hold that DeCarlo's claim necessarily arose under the Copyright Act because, "[s]ince the effective date of the Copyright Act of 1976, the exclusive source of rights arising from authorship of a work fixed in tangible

---

claims, but the Court addresses the counterclaims nonetheless.

12. Ans. ¶ 78.

13. *Id.*

14. *Id.* ¶¶ 88–97.

15. 17 U.S.C. § 101 *et seq.*

16. *NBA v. Motorola, Inc.,* 105 F.3d 841, 848 (2d Cir.1997).

17. Counterclaim Def. Mem. 6; Def. Mem. 4.

18. 17 U.S.C. § 301.

19. *NBA,* 105 F.3d at 848.

20. Def. Mem. 4.

21. *Id.*

form is that statute." [22]

■ So too here. In view of the *Josie* decision, there is no basis for DeCarlo's contention that he has any ownership rights in the *Sabrina* comic strips or characters except to the extent, if any, that he owns such rights under the Copyright Act.[23] Hence, if the rights he asserts under state law fall within the "general scope" requirement—that is, if they are essentially equivalent to rights protected under the Copyright Act—his state law claims are preempted. On the other hand, if "the state law claim requires an extra element 'instead of or in addition to the acts of reproduction, performance, distribution or display ... then the right does not lie within the general scope of copyright and there is no preemption.' " [24]

■ Each of DeCarlo's challenged claims for relief is based on the common allegation that ACP and its principals "wrongfully transferred control" over DeCarlo's "property in the ... characters" in violation of the Copyright Act.[25] Moreover, the crux of each of the challenged claims, even considered without regard to the express violations of the Copyright Act that DeCarlo alleges, is copyright infringement. The second claims for relief complain of the use of the characters allegedly owned by DeCarlo in other works without his permission.[26] The essence of the third, fourth and fifth claims for relief—misap-propriation, conversion and unjust enrichment—is that the counterclaim defendants are said to be exploiting rights that allegedly belong to DeCarlo by virtue of authorship—in other words, exploiting and thus infringing rights that are those of a copyright holder. Finally, none of these claims requires proof of any element "instead of or in addition to the acts of reproduction, performance, distribution or display" [27]—each complains of the benefit to the counterclaim defendants derived from their infringement of the exclusive rights of a copyright holder. Accordingly, all of these claims are within the general scope of copyright and preempted by the Copyright Act.

### The Breach of Fiduciary Duty Claims

■ The first claim for relief in each of the so-called first and third counterclaims is for breach of confidential relationship and fiduciary duty. As indicated above, the gravamen of each is that ACP and its principals allegedly "assumed a position of special trust and confidence with regard to" DeCarlo which they breached by using his creations "other than in accordance with the terms of their agreements," viz. by transferring control of the characters to others.[28]

"The express and implied obligations assumed by a publisher in an exclusive li-

---

**22.** 127 F.Supp.2d at 505.

It rejected, as well, DeCarlo's contention that comic strip characters are not susceptible of federal copyright protection. *Id.* at 505 & n. 49.

**23.** Indeed, DeCarlo alleges here that the counterclaim defendants violated his rights under Sections 106(5) and 201(c) of the Act, thus implicitly acknowledging his claim of copyright ownership.

**24.** *Lennon v. Seaman,* 63 F.Supp.2d 428, 435 (S.D.N.Y.1999) (quoting *Computer Assocs.*

*Int'l v. Altai, Inc.,* 982 F.2d 693, 716 (2d Cir.1992)).

**25.** Ans. ¶¶ 59, 86. Nowhere does DeCarlo seek to reconcile his contention that he relies only on state law property rights with the contention that his rights were transferred in violation of the Copyright Act.

**26.** Ans. ¶¶ 64, 91.

**27.** *Computer Assocs. Int'l.,* 982 F.2d at 716.

**28.** Ans. ¶¶ 62, 89.

censing contract are not, as a matter of law, fiduciary duties." [29] DeCarlo, however, relies on dictum in *Mellencamp v. Riva Music Ltd.*[30] that "trust elements come into play when the publisher tolerates infringing conduct or participates in it" [31] and argues that his allegation that ACP has infringed his rights to the *Sabrina* characters is sufficient to support the legal conclusion that there was a special relationship of trust and confidence.

DeCarlo's assertions fail to state a claim upon which relief may be granted. The dictum in *Mellencamp* to which DeCarlo refers is based on that court's analysis of *Cortner v. Israel*,[32] *Manning v. Miller Music Corp.*,[33] *Nelson v. Mills Music, Inc.*,[34] and *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*,[35] none of which conclusively supports the view DeCarlo now urges upon this Court. *Cortner* and *Manning* merely found that an assignment of copyright in exchange for royalty payments creates "an equitable trust relationship ... which gives the composer standing to sue for infringement of that copyright." [36] *Nelson* found a publisher's promotion of a song which infringed the author's to be "a breach of contract or trust." [37] To the extent that those words might be construed as finding the existence of a fiduciary relationship, however, they have been overruled by *Van Valkenburgh*, which specifically upheld the Appellate Division's finding that there was no fiduciary relationship between author and publisher despite the latter's publishing of potentially infringing material.[38] In fact, the Appellate Division cited *Nelson* for the proposition that such an action "more properly may be considered [one for] ... breach of contract with demonstrated failure by defendants to use their 'best efforts', as they agreed to do under the publishing contract, for the continued promotion and sale of plaintiff's books." [39] Moreover, even if the Court adopted *Mellencamp*'s reading of *Cortner*, *Manning* and *Nelson*, those cases are distinguishable in that they involved copyright assignees publishing material that directly competed with that of the beneficial copyright owner or tolerating the publication of such material by others. Here, DeCarlo alleges not that ACP has published or acquiesced in the publishing of material that directly competes with his own, but rather that ACP transferred his rights in the characters.

**29.** *Mellencamp v. Riva Music Ltd.*, 698 F.Supp. 1154, 1159–60 (S.D.N.Y.1988) (citing *Sobol v. E.P. Dutton, Inc.*, 112 F.R.D. 99, 104 (S.D.N.Y.1986) (Weinfeld, J.)); *accord, (Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142, *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972)); *see also Liebowitz v. Elsevier Science Ltd.*, 927 F.Supp. 688, 711 (S.D.N.Y.1996).

**30.** 698 F.Supp. 1154.

**31.** *Id.* at 1159. *See also Don King Productions, Inc. v. Douglas*, 742 F.Supp. 741, 769–70 (S.D.N.Y.1990).

**32.** 732 F.2d 267 (2d Cir.1984).

**33.** 174 F.Supp. 192 (S.D.N.Y.1959).

**34.** 278 A.D. 311, 104 N.Y.S.2d 605 (1st Dept. 1951), *aff'd*, 304 N.Y. 966, 110 N.E.2d 892 (1953).

**35.** 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142, *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972).

**36.** *Cortner*, 732 F.2d at 271.

**37.** *Nelson*, 278 A.D. at 312, 104 N.Y.S.2d at 606.

**38.** *Van Valkenburgh*, 33 A.D.2d 766, 306 N.Y.S.2d 599, 600–01 (1st Dept.1969), *aff'd*, 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142, *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972).

**39.** *Id.*

DeCarlo's allegations that there were agreements between the parties and that ACP and its principals exploited the characters in ways not contemplated by those agreements alleges, at most, breach of contract. The allegations do not set forth a basis sufficient to conclude that there was a fiduciary relationship among the parties. The breach of fiduciary duty claims therefore are legally insufficient.

### The Lanham Act Claim

■ DeCarlo claims also that ACP and its principals are guilty of false designation of origin in violation of Section 43(a) of the Lanham Act [40] in that episodes of the *Sabrina* television and animated cartoon series carry the credit line "Based on Characters Appearing in Archie Comics." He claims that this constitutes "reverse passing off"—that ACP promotes DeCarlo's product under its own name whereas DeCarlo claims to have created those characters himself.[41] He acknowledges that the statement "does not indicate that ACP is the creator or even the owner of the Sabrina characters," but argues that "the credit fails to give appropriate credit to Mr. De-

Carlo for his artistic talent in creating the Sabrina characters." [42]

Section 43(a) of the Lanham Act prohibits false references or misleading representations likely to cause confusion as to the origin of a work.[43] Whereas copyright law does not provide an author with "an inherent right to be credited as the author of the work," [44] "evolving notions under Section 43(a) of the Lanham Act may accord a more general attribution right." [45] In particular, some courts have found that reverse passing off may be implied when a defendant omits an author's name even without substituting another.[46] Yet even in these cases the misrepresentation of source is an essential element of the claim; any attribution required under the Lanham Act arises out of source confusion and not, as DeCarlo essentially argues, "out of an inherent connection between authorial genius and literary offspring." [47]

The credit line at issue here does not speak to the origin of the characters. It simply (and truthfully) states that the characters, whoever created them, appear in Archie comics. There are no allegations suggestive of confusion as to the source of

---

**40.** 15 U.S.C. § 1125(a).

**41.** *See Waldman Pub. Corp. v. Landoll, Inc.,* 43 F.3d 775, 780 (2d Cir.1994) (reverse passing off occurs when A promotes B's products under A's name).

**42.** Def. Mem. 13.

**43.** *See, e.g., Lipton v. Nature Co.,* 71 F.3d 464, 473 (2d Cir.1995); *Waldman,* 43 F.3d at 780.

**44.** *Graham v. James,* 144 F.3d 229, 236 (2d Cir.1998).

**45.** 3 MELVILLE B. NIMMER AND DAVID NIMMER, NIMMER ON COPYRIGHT (hereafter "NIMMER") § 8D.03[A][2], at 8D–31 (2000).

**46.** *See Smith v. Montoro,* 648 F.2d 602, 605 (9th Cir.1981) (" 'Implied' reverse passing off occurs when the wrongdoer simply removes

or otherwise obliterates the name of the manufacturer or source and sells the product in an unbranded state."); *Lamothe v. Atlantic Recording Corp.,* 847 F.2d 1403, 1408 (9th Cir.1988) (same); 3 NIMMER § 8D.03[A][2], at 8D–35. Dictum in at least one Second Circuit case hints at this theory. *See Waldman,* 43 F.3d at 781 ("an author may claim violation of section 43(a) if his work is published without his name").

**47.** 3 NIMMER § 8D.03[A][2], at 8D–38. NIMMER explains by way of example that a radio station's omission of attribution when it plays a song "violates neither the composer's nor performer's protectable interests, absent any contractual undertaking by the radio station to give credit ... [f]or the public is not misled as to the source of origin of the tune." *Id.*

the *Sabrina* programs. Thus, even if the Court were to find the "implied reverse passing off" theory persuasive, it would not be applicable here. The Lanham Act claim therefore is insufficient as a matter of law.

### The Motion for Sanctions

■ The counterclaim defendants seek Rule 11 sanctions on the ground that the counterclaims are frivolous. While the counterclaims fail to state a claim upon which relief may be granted, there is no basis for imposition of sanctions here. The arguments DeCarlo advances in the first and third counterclaims admittedly test the boundaries of settled law. But it cannot be said that the arguments patently had "no chance of success" thus warranting the drastic remedy of sanctions.[48]

### Conclusion

The motion to dismiss the counterclaims is granted in all respects, provided, however, that defendant is granted leave to replead the first claims for relief of the first and third counterclaims by serving and filing an amended pleading within ten days of the date of this order.

SO ORDERED.

---

**48.** *Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.,* 186 F.3d 157, 167 (2d Cir.1999) (quoting *Mareno v. Rowe,* 910 F.2d 1043, 1047 (2d Cir.1990), *cert. denied,* 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991)).